**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SANDPIPER VILLAGE CONDOMINIUM
ASSOCIATION, INC., a Florida
corporation and all others similarly
situated; CRAIG OSTERGREN, co-
conservator for Keith Ostergren, a
minor, on behalf of themselves
and all others similarly situated;
CHERYL OSTERGREN, co-conservator
for Keith Ostergren, a minor, on
behalf of themselves and all others
similarly situated; KEITH
OSTERGREN, a minor; BYRON
ALTON; SUSAN ALTON; CPC LTD.,
Washington Real Estate
Developer,
                            *Plaintiffs,*

                v.

LOUISIANA-PACIFIC CORPORATION, a
Delaware corporation,
                *Defendant-Appellee,*

LESTER BUILDING SYSTEMS, a
division of Butler Manufacturing
Company; LESTER'S OF MINNESOTA,
INC.,
            *Respondents-Appellants,*

No. 03-35058

D.C. No.
CV-95-00879-JO

OPINION

14557

State of Minnesota,
                    *Respondent-Amicus,*

                    and

Harry A. Merlo,
                              *Defendant,*

State of Minnesota,
                              *Respondent,*

Insurance Company of North
America; Cigna Insurance
Company of North America;
Northwestern Pacific Indemnity
Company, Agricultural
Insurance Company; National
Union Fire Insurance Company;
Lexington Insurance Company;
Granite State Insurance
Company,
                    *Defendant-Intervenors,*

                    v.

James W. Gilles; Dale J.
Matherly; Douglas Meckling;
Michael L. Watts,
                    *Plaintiff-Intervenors.*

Appeal from the United States District Court
for the District of Oregon
Robert E. Jones, District Judge, Presiding

Argued and Submitted
May 4, 2004—Portland, Oregon

Filed October 24, 2005

Before: Stephen Reinhardt, Barry G. Silverman and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton;
Concurrence by Judge Silverman;
Dissent by Judge Reinhardt

**COUNSEL**

Kell M. Damsgaard (argued) and Brian W. Shaffer, Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania; Janet M. Schroer, Hoffman, Hart & Wagner, Portland, Oregon, for the respondent-appellant.

Michael H. Simon (argued) and Jeffrey C. Dobbins, Perkins Coie LLP, Portland, Oregon, for the defendant-appellee.

Mike Hatch, Attorney General, David Woodward, Assistant Attorney General, for the State of Minnesota.

## OPINION

CLIFTON, Circuit Judge:

Lester Building Systems and its affiliate, Lester's of Minnesota, Inc. (collectively "Lester"), appeal an order permanently enjoining entry of judgment on a portion of a jury verdict rendered in favor of Lester and against Louisiana-Pacific Corporation ("L-P") in Minnesota state court. *In re Louisiana-Pacific Inner-Seal Siding Litigation*, 234 F. Supp. 2d 1170 (D. Or. 2002). The district court exercised its authority under the All Writs Act, 28 U.S.C. § 1651, to partially enjoin entry of the judgment on the ground that the state court award was inconsistent with the settlement reached in a prior nationwide class action involving L-P and over which the court retained jurisdiction. We conclude that the injunction violates the Anti-Injunction Act, 28 U.S.C. § 2283, and reverse.

## I.   Background

*Class Action and Settlement*

L-P manufactures building materials from industrial wood products and pulp and markets itself as an innovator in the development of new, affordable and environmentally advanced products for home and commercial builders. Beginning in 1985, L-P manufactured and sold an exterior composite-wood siding designed to resemble conventional lumber for use on residential and other structures. L-P referred to this siding as "Inner-Seal Siding," a registered trademark. L-P provided a 25-year limited warranty with the purchase of Inner-Seal Siding.

In 1995, owners of structures on which Inner-Seal Siding had been installed brought a class action lawsuit in the District Court for the District of Oregon for damages resulting from the failure of Inner-Seal Siding. The class plaintiffs alleged that while L-P had advertised and marketed Inner-Seal Siding as durable, effective and superior to other types of exterior siding, the siding had prematurely rotted, buckled, cracked and otherwise deteriorated when exposed to normal weather conditions.

The federal action, which covered a nationwide class of claimants, settled shortly after it was filed. On April 26, 1996, the district court approved and adopted a settlement agreement and entered an order and final judgment. Pursuant to the settlement agreement and order, L-P agreed to finance a settlement fund and, in exchange, class claims related to the failure of Inner-Seal Siding were released.[1] L-P also agreed to

---

[1]The settlement agreement required L-P to make a minimum payment of $275,000,000 into a settlement fund. Qualified claims were paid from that fund and class members were barred from litigating any claim related to the failure of Inner-Seal Siding for a period of four years from the date of the final order and judgment. After the expiration of the fourth year, the settlement agreement gave L-P the option of funding the remaining unpaid claims, if any. If L-P agreed to fund the outstanding claims, all class members remained bound by the agreement for another year. If L-P elected not to fund the outstanding obligations, the settlement terminated with respect to unfunded claims, leaving those class members free to pursue new lawsuits against L-P. This annual reevaluation of remaining claims continued until the end of the seventh year, at which time the claims administrator was ordered to notify L-P if the settlement fund proved insufficient to satisfy all approved claims filed before January 1, 2003. Within 60 days of notification, L-P was directed to advise class counsel whether it intended to satisfy the unfunded claims. If L-P agreed to fund the remaining claims, it was required to make additional payments "at the end of each of the next two 12-month periods or until all claims [were] paid in full." Satisfaction of the "final funding" obligation bound all class members "for an additional 24-month period." On the other hand, if L-P determined not to fund the outstanding claims, all class members whose claims remained unsatisfied for a period of 90 days were authorized to "pursue whatever legal remedies [were] available to them without regard to the release."

reinstate the balance of the term on its 25-year warranty upon termination of the settlement agreement, to be measured from the date of original installation. The settlement was binding on all class members, save those who timely requested exclusion from the class.[2] The settlement did not cover claims arising from the failure of new siding installed after January 1, 1996.

In addition to the release of claims against L-P, the class members released all claims related to the failure of Inner-Seal Siding (installed prior to January 1, 1996) against persons or entities "involved in the distribution, installation, construction and first time sale of structures with Exterior Inner-

---

Because of the large number of claimants, L-P and class counsel, with approval of the special master overseeing the settlement, created several alternative procedures through which class members, at their election, could receive compensation ahead of schedule but at a discounted rate. None of the alternative compensation procedures in any way modified or changed the original settlement agreement.

[2]All members of the "Settlement Class" were "barred and permanently enjoined from prosecuting 'Settled Claims' . . . against L-P." The "Settlement Class" was defined as "all Persons who have owned, own, or subsequently acquire Property on which Exterior Inner-Seal Siding has been installed prior to January 1, 1996." The settlement agreement excluded claimants who timely requested exclusion from the class and claimants who were members of a certified class action in Florida titled *Anderson v. Louisiana Pacific Corp.*, No. 94-2458-CA-01. A "Settled Claim" was defined as

> any claim, . . . damage, loss or cost, action or cause of action, of every kind and description that the Releasing Party has or may have, whether known or unknown, asserted or unasserted, latent or patent, that is, has been, could reasonably have been or in the future might reasonably be asserted by the Releasing Party either in the Action or in any other action or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any of the Defendants, arising from or in any way relating to any defects or alleged defects of Exterior Inner-Seal Siding, or any part thereof.

Seal Siding." This provision was included to foreclose the possibility that class members would bring claims against businesses located in the Inner-Seal Siding chain of distribution. Claims against L-P by persons or entities within the chain of distribution were not released, however.

Under the settlement agreement and order, the district court retained jurisdiction, described as follows:

> [E]xclusive and continuing jurisdiction over the Actions and Parties, including all members of the Class, the administration and enforcement of the settlement, and the benefits to the Class, including for such purposes as supervising and implementation, enforcement, construction, and interpretation of the Settlement Agreement.

By September 2003, L-P had agreed to meet all funding obligations and had made cash payments totaling approximately $509 million to about 142,000 claimants in satisfaction of approximately $823 million in claims.[3]

*Minnesota Lawsuit*

Lester, a Minnesota corporation, designs, constructs and sells pre-engineered wood buildings for livestock confinement. Lester purchased Inner-Seal Siding from 1991 to 1996 and incorporated the siding into the structural wall panels of buildings sold to its customers. As a distributor of buildings equipped with Inner-Seal Siding, Lester was not a class member and was not a party to the settlement agreement. Class

---

[3]This figure includes claims that were satisfied through the alternative funding procedures, *see supra* at 14564-65 n.1, which afforded claimants an opportunity to receive discounted payments on an accelerated basis in order to minimize delay and uncertainty. According to the special master's report dated November 17, 2003, only $18.1 million in valid, approved claims remained unfunded as of the end of the claims period. L-P has also agreed to fund those claims.

member claims against Lester were released by the settlement, however.

In March 2000, Lester brought an action against L-P in Minnesota state court. Lester sought damages for breach of contract, breach of express and implied warranties, fraud and loss of business reputation as a consequence of having used defective Inner-Seal Siding in its buildings. Lester alleged that it had sold approximately 2,600 buildings with Inner-Seal Siding but that it stopped using the siding in 1996 because of complaints from its dealers and customers. Lester further alleged that it "has received and will continue to receive hundreds of claims and complaints . . . which must be administered and resolved in order to avoid further losses."

Lester recognized that new claims by class members were foreclosed by the settlement agreement but observed that the settlement "provide[d] no relief or monetary compensation to [Lester], [its] dealers, or others similarly situated." Because its injuries were not redressed by the settlement agreement, Lester asserted that L-P was

> obligated and required: (i) to pay, reimburse, and indemnify [Lester] for all monies [it] pay[s] and expenses [it] reasonably incur[s] in properly satisfying the claims of [its] dealers and customers arising from defects in and failure of L-P's Inner-Seal; and (ii) to pay, reimburse, and indemnify [Lester] for all other damages and losses [it has] now incurred and will incur as a result of [its] purchase and use of L-P's Inner-Seal [Siding].

Lester sought damages "in an amount to be determined at trial" and "an affirmative injunction requiring L-P to resume honoring its warranties and other legal obligations, including, but not limited to reimbursing [Lester] for satisfying the claims of [Lester's] dealers and customers."

L-P disagreed with Lester's interpretation of the res judicata effect of the settlement agreement and moved for partial summary judgment on all present and future claims against L-P related to the failure of Inner-Seal Siding. In particular, L-P argued that Lester's claim for the costs to repair its customers' buildings was barred because a substantial portion of Lester's customers were members of the prior class action and covered by the settlement agreement.

The trial court denied the motion. The court held that under Minnesota law a distributor can recover costs it may incur in the future with respect to a defective product that was placed in the stream of commerce. The court concluded that there were genuine issues of material fact as to whether the settlement agreement precluded recovery of those damages and with respect to the amount of those damages, if any.

The case was tried in September and October 2002.[4] A significant portion of the trial centered on the issue of damages. Lester argued that moral and business compulsions required it to remove and replace the Inner-Seal Siding on every building that it sold, even if the owner of the building had received at least some compensation in the prior settlement with L-P. Lester's position was explained by its president, who testified that

> the best thing we could expect to come out of this is that we finally get . . . the farmer what he's entitled to, which is he bought a building and expected to have his siding hold up, and that's what we need to make happen and that's why we're here. We're trying to make that result happen.

---

[4]The parties filed portions of the trial transcript with the district court. On appeal, Lester offered additional portions of the transcript that were previously unavailable and asked that we take judicial notice of the same. We grant the request. *See* Fed. R. Evid. 201.

. . .

> I want each of you to know that we're going to fix
> these buildings. That's why we're here. Counsel in
> some of the lead up to trial has at least left me with
> some kind of general impression that, you know, is
> there any guarantee that the customer will be taken
> care of here? And I would ask you to look at all the
> different people from Lester and its dealers that
> you've got a chance to meet over the last two weeks
> and know that we're here because we want to fix
> these buildings and that's what we're going to do.

Lester offered evidence that repairing the siding on every affected building would cost $13.2 million. Of that total, approximately $2 million was for buildings that were fabricated after January 1, 1996, and thus not covered by the settlement. The evidence further showed that the total cost of the siding purchased by Lester and used in its buildings was $3.4 million, with approximately $240,000 of that amount falling outside of the terms of the settlement.

At the conclusion of Lester's case, L-P moved for directed verdict. L-P again argued that a portion of Lester's claims were barred by the class action settlement agreement. The trial court denied the motion. The court reasoned that the motion was premature because L-P planned to submit expert testimony concerning the mechanics of the class action and settlement. The court concluded that a final resolution of the effect of the settlement agreement could be made after further factual development.

As the trial court anticipated, the defense focused on the effect of the class action settlement. For instance, L-P called the special master appointed by the district court to oversee the settlement. The special master explained the settlement process, the terms of the settlement and the district court's order and final judgment and decree. L-P also called an expert

witness who testified that, based on a comparison of the list of opt-outs and a list of purchasers of Lester's buildings, none of Lester's customers had opted out of the class action settlement. The expert further asserted that as of October 11, 2002, $640,000 had been paid to Lester's customers from the settlement fund.[5]

The trial court, apparently accepting L-P's argument that the class action settlement precluded damages for repair costs involving buildings that were covered by the settlement agreement, instructed the jury that repair costs were not recoverable unless they fell outside the scope of the settlement:

> You have heard evidence of the settlement of a nationwide class action against Louisiana-Pacific. Lester is not a party to that action and therefore the claims that it makes in this case are not barred by the class action settlement. The Court has determined, however, that one element of Lester's damages, its claims for the cost to repair the buildings with Inner-Seal, is barred as to any particular building, unless one of the following exceptions applies:
>
> (a) the building was constructed on or after January 1, 1996;
>
> (b) the building has or may have a siding performance failure after January 1, 2003; or
>
> (c) the building is one for which claims are submit-

---

[5]The record does not reflect the actual number of Lester customers who filed claims under the settlement or the amount that each customer received in relation to their submitted claims. Two of Lester's customers testified at trial that recovery under the settlement was about 30% of repair costs.

ted prior to January 1, 2003, have not been paid and the class action is not funded in August 2003.[6]

Consistent with the court's instruction, the special verdict form directed the jury to specify the damages, if any, awarded for repair costs and the damages it would have awarded if the settlement agreement had not barred certain claims.

Following deliberations, the jury returned a verdict of $29.6 million in favor of Lester.[7] The jury determined that an award of $13.2 million was necessary to compensate Lester for the cost to repair buildings. The jury listed the same figure, $13.2 million, as the amount it would have awarded but for the class settlement. In other words, the jury determined as a factual matter that none of the repair costs were covered by the settlement. The jury also awarded Lester $3.4 million for the cost

---

[6]Subsection (b) was likely included to reflect the exception in the settlement agreement for claims for siding failures that occurred after January 1, 2003. Subsection (c) may have followed from Lester's argument that if L-P refused to fund the remaining claims, Lester would be entitled to damages for repair costs. Although L-P subsequently committed to funding the remaining claims, the dates referred to in subsections (b) and (c) were still in the future at the time the instructions were given to the jury. Thus, the jury was, in effect, asked to anticipate the future, which might help to explain the verdict that it reached.

[7]Questions 8 and 9 of the completed verdict form provided:

8.   What amount of money would fairly compensate Lester?

| | |
|---|---|
| Cost of Inner-Seal: | $3.4 million |
| Cost to Repair Buildings (those not barred by the class action): | $13.2 million |
| Lost Profits: | $10.2 million |
| Cost to Restore Goodwill: | $2.8 million |
| Total: | $29.6 million |

9.   Without regard to the class action, what is the total amount of money that would fairly and adequately compensate Lester for the Cost to Repair Buildings (both those in and out of the class action)?

$13.2 million

of Inner-Seal Siding, $10.2 million for lost profits and $2.8 million to restore goodwill.

On October 24, 2002, the trial judge signed and filed the Findings of Fact, Conclusions of Law, and Order for Judgment based on the jury verdict. In accordance with the Minnesota Rules of Civil Procedure, the judge stayed entry of judgment for 30 days.[8] By order dated November 18, 2002, the stay was extended at L-P's request until post-trial motions were resolved.

*Federal Injunction*

On November 6, 2002, just three weeks after the jury verdict in favor of Lester, L-P filed a motion to enforce the settlement agreement in the Oregon federal district court with continuing jurisdiction over the settlement. L-P asked the district court to enjoin the state court from entering judgment on the portion of the verdict that was inconsistent with the class action settlement, namely, the jury's award of damages for the cost to repair buildings that had Inner-Seal Siding installed prior to January 1, 1996 and the award for the cost of the Inner-Seal Siding that Lester had purchased from L-P.

On December 13, 2002, the district court granted L-P's motion in part and issued an "injunction enjoining the Minnesota state court from entering judgment on the portion of the jury's damages award that is encompassed in and precluded by the class action settlement agreement." *In re Louisiana-Pacific*, 234 F. Supp. 2d at 1172. The court found that that portion of the award amounted to $11.2 million.[9] *Id.* at 1182.

---

[8]Such a stay allows for the resolution of any post-trial motions without the need to reopen judgment if relief is granted. *See* Minn. R. Civ. P. 58.01 cmt; *id.* 58.02.

[9]The court reached this amount by subtracting $2 million—the cost to repair and replace siding on buildings constructed after January 1, 1996—from the $13.2 million awarded as the total repair and replacement damages. *In re Louisiana-Pacific*, 234 F. Supp. 2d at 1174.

Based on its review of Minnesota caselaw, the court determined that the state court had erred when it held that Lester could recover the cost to repair defective Inner-Seal Siding on its customers' buildings.[10] *Id.* at 1177, 1180. Because Minnesota state law did not recognize the repair costs claim, the court concluded that "the Minnesota jury verdict wrongly includes damages expressly encompassed in and precluded by the nationwide class action settlement." *Id.* at 1177-78.

Having found that the verdict included damages covered by the settlement, the court reasoned that allowing the judgment to stand in full would not only "circumvent the settlement agreement" but also "seriously impair the integrity of this court's Order[ ] and directly interfere with and seriously impair [the court's] ability to supervise, implement, enforce, construe and interpret the class action settlement agreement over which [the court has] retained exclusive jurisdiction." *Id.* at 1180. Because federal intervention in the state proceeding was "necessary both in aid of [its] continued jurisdiction and to protect and effectuate [its] Order, Final Judgment and Decree," the court held that the injunction was proper under the All Writs Act and not barred by the Anti-Injunction Act. *Id.* at 1178, 1180. The court did not, however, enjoin entry of judgment on the $3.4 million in damages that represented the difference between what Lester had paid for Inner-Seal Siding and the actual value of the siding. *Id.* at 1182.

Lester timely appealed.

---

[10]This point was made explicit during the hearing on L-P's motion for injunctive relief, where the district court opined that "the judge in Minnesota . . . did wrong. The . . . hog barn damage [claims] of people within a class should never have been submitted to that jury. That was wrong in every respect." In its order granting the injunction, the court confirmed its conclusion that "the Minnesota state court was wrong to submit Lester's damages claim for repair costs covered by the class action settlement to the jury for consideration." *In re Louisiana-Pacific*, 234 F. Supp. 2d at 1180.

*State Court Judgment*

Before the injunction issued, L-P filed post-trial motions for judgment notwithstanding the verdict and for a new trial in state court. Through the motions, L-P renewed its argument that a portion of the verdict was barred by the class settlement. The motions were pending when the district court issued the injunction.

Following entry of the injunction, the state trial court took up and denied the motions. The court determined that the award was supported by the evidence presented at trial and should not be disturbed. Shortly thereafter, the court issued a revised Order for Judgment. To comply with the injunction, the court entered judgment awarding Lester $20,074,424.21.[11] The court held that if the injunction was vacated, reversed or lifted on appeal, it would reinstate the jury's original award of $29.6 million, plus costs and interest.

L-P appealed. The Minnesota Court of Appeals affirmed. The court declined to address whether Lester's claim for repair costs was properly submitted to the jury, however, because that presented an issue on appeal to this Court. *Lester Bldg. Sys. v. Louisiana Pacific Corp.*, No. A03-48, 2004 Minn. App. Lexis 156 (Feb. 17, 2004). The court explained that L-P could renew its challenge to the award of repair cost damages if the injunction was lifted. L-P's petition for review by the Minnesota Supreme Court was denied. *Lester Bldg. Sys. v. Louisiana Pacific Corp.*, No. A03-48, 2004 Minn. Lexis 248 (Apr. 28, 2004).

---

[11]The court reasoned that absent the injunction Lester was entitled to recover $31,375,862.21. That figure was calculated by adding the original jury verdict of $29.6 million, plus $1,519,811 in pre-verdict interest, $189,255 in post-verdict interest and $66,796.21 in costs and disbursements, and subtracting the portion of the verdict enjoined by the district court, $11.2 million, and $101,438 in interest on that amount.

## II.   Standard of Review

We review the exercise of jurisdiction de novo. *Gerritsen v. Consulado Gen. De Mexico*, 989 F.2d 340, 344 (9th Cir. 1993). We review the decision to grant a permanent injunction for abuse of discretion. *United States v. Yacoubian*, 24 F.3d 1, 3 (9th Cir. 1994). A legal error amounts to an abuse of discretion. *Western Sys., Inc. v. Ulloa*, 958 F.2d 864, 867 (9th Cir. 1992). Accordingly, "[t]he question whether the district court had the power to issue the injunction is . . . reviewed de novo, while its decision to exercise that power is reviewed for an abuse of discretion." *Id.* Factual findings underlying an injunction are reviewed for clear error. *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 653 (9th Cir. 2002).

## III.   Subject Matter Jurisdiction

We first address Lester's jurisdictional argument.[12]

---

[12]In addition to its argument that the district court lacked subject matter jurisdiction, Lester contends that it was not subject to the district court's equitable powers because it was not properly served and lacked the requisite minimum contacts with the forum state. The improper service portion of Lester's argument is easily resolved. Lester had actual knowledge of the proceedings through a mailed copy of L-P's motion to enforce the class settlement. That gave Lester an opportunity to appear and oppose the motion. Lester accepted the opportunity, appeared before the district court and contested the legality of the injunction. Nothing more was required to protect Lester and its interests. *See, e.g.*, *In re Baldwin-United Corp.*, 770 F.2d 328, 340 (2d Cir. 1985).

We do not separately discuss the issue of minimum contacts, however. Although personal jurisdiction is ordinarily determined at the outset as a threshold matter, in this case that issue is inexorably intertwined with the merits. If the state court action threatened the jurisdiction of the district court or implicated the res judicata effect of the settlement agreement, Lester would be subject to the jurisdiction of the district court in Oregon, as the court with continuing jurisdiction over the settlement. On the other hand, if the state court lawsuit did not affect the settlement or the district court's jurisdiction over the same, the connection between Lester and the forum state would be more tenuous. Because we conclude that the district court lacked the power to enjoin the state court proceedings, we need not examine whether the district court had the power to enter a binding order against Lester.

**[1]** Federal courts are courts of limited jurisdiction and possess "only that power authorized by the Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). Even where subject matter jurisdiction is satisfied in the original action, enforcement of a final settlement agreement and order "requires its own basis for jurisdiction" before the federal court may "interpret and apply its own judgment to the future conduct contemplated by the judgment." *Flanagan v. Arnaiz*, 143 F.3d 540, 544-45 (9th Cir. 1998). The requisite independent basis for jurisdiction may be supplied by a provision in the settlement agreement and order that expressly retains jurisdiction in the district court for the purpose of overseeing and enforcing the prior judgment. *Id.* at 544. Such a provision, in conjunction with the All Writs Act, empowers a district court to protect its judgment from a subsequent action that frustrates the purpose of the settlement agreement and order. *In re Baldwin-United*, 770 F.2d at 335; *see also Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 34 n.1 (2002); *Flanagan*, 143 F.3d at 544.

In this case, the district court had subject matter jurisdiction over the underlying class action.[13] The settlement agreement and order in turn retained jurisdiction in the district court over the "Actions and Parties, including all members of the Class, the administration and enforcement of the settlement, and the benefits to the Class, including for such purposes as supervising and implementation, enforcement, construction, and interpretation of the Settlement Agreement." This express retention of jurisdiction, coupled with the All Writs Act, gave the district court an adequate jurisdictional basis to entertain L-P's motion to protect the settlement agreement through an injunction.[14] *See In re Baldwin-United*, 770 F.2d at 335; *see also Syngenta*, 537 U.S. at 34 n.4; *Flanagan*, 143 F.3d at 544.

---

[13]We reject Lester's implied collateral attack on subject matter jurisdiction over the class action itself. *See, e.g.*, *Snell v. Cleveland, Inc.*, 316 F.3d 822, 827 (9th Cir. 2002).

[14]As the Second Circuit explained in *In re Baldwin-United*, the authority retained by a district court in a settlement agreement and order that provides for continuing and exclusive jurisdiction, in conjunction with the All Writs Act, conveys subject matter jurisdiction to protect a prior judgment from threats by parties and nonparties alike. *See* 770 F.2d at 338.

**[2]** Lester concedes that the district court retained jurisdiction to protect and enforce the settlement agreement but argues that the court did not have jurisdiction over its state law claims. Lester misconstrues the substantive issue before the district court. L-P did not ask the district court to resolve Lester's state law claims. The sole question before the court on L-P's motion for injunctive relief was whether the state court action interfered with or threatened the prior settlement agreement. The district court was thus called upon to interpret the settlement agreement and to determine whether federal law allowed it to enjoin the state proceedings. By retaining jurisdiction over the enforcement of the settlement agreement, the court preserved the authority to make such a determination and thereby protect its prior judgment from a subsequent action that threatened the same.

## IV.   Anti-Injunction Act

**[3]** We turn to the propriety of the injunction.[15] The district court drew the authority to issue the injunction from the All Writs Act, which allows federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The All Writs Act is limited by the Anti-Injunction Act, which prevents a federal court from enjoining the "proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The limitations expressed in the Anti-Injunction Act "rest[ ] on the fundamental constitutional independence of the States and their courts," *Atlantic Coast Line R.R. Co. v. Bhd. of*

---

[15]In addition to its arguments under the Anti-Injunction Act, Lester maintains that the injunction violated the Full Faith and Credit Act, its due process rights and the *Rooker-Feldman* doctrine and further contends that L-P was not entitled to an injunction because it had an adequate remedy at law and failed to show irreparable harm. Because we hold that the injunction cannot be sustained under the Anti-Injunction Act, we do not reach Lester's other contentions.

*Locomotive Eng'rs*, 398 U.S. 281, 287 (1970), and reflect "Congress' considered judgment as to how to balance the tensions inherent in such a system," *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988). Rooted firmly in constitutional principles, the Act is designed to prevent friction between federal and state courts by barring federal intervention in all but the narrowest of circumstances. *See Alton Box Bd. Co. v. Esprit de Corp.*, 682 F.2d 1267, 1271 (9th Cir. 1982); *Bennett v. Medtronic*, 285 F.3d 801, 805 (9th Cir. 2002). Accordingly, the limited exceptions to the Anti-Injunction Act will not "be enlarged by loose statutory construction." *Atlantic Coast Line*, 398 U.S. at 287. Rather, "[a]ny doubts as to the propriety of a federal injunction against state court proceedings [will] be resolved in favor of permitting the state courts to proceed," *id.* at 297, which means that we will uphold an injunction only on "a strong and unequivocal showing" that such relief is necessary, *Bechtel Petroleum, Inc. v. Webster*, 796 F.2d 252, 253-54 (9th Cir. 1986).

The district court recognized that its equitable powers were circumscribed by the Anti-Injunction Act and held that the injunction was permissible under the second and third exceptions to the Act.[16] With respect to the second exception, the court concluded that the challenged portion of the jury verdict "directly interfere[d] with and seriously impair[ed its] ability to supervise, implement, enforce, construe, and interpret the class action settlement over which [it] retained exclusive jurisdiction." *In re Louisiana-Pacific*, 243 F. Supp. 2d at 1180. With respect to the third exception, the court reviewed Minnesota law and determined that the cases relied on by the trial court did not in fact authorize Lester to recover the cost to repair Inner-Seal Siding. *Id.* Because state law did not allow repair costs as damages, the court reasoned Lester had effectively acted as an agent for class members by "asserting

---

[16]The first exception to the Anti-Injunction Act, which allows an injunction where "expressly authorized by Act of Congress," is not at issue here.

damages claims that belonged to the end users." *Id.* at 1177. Thus, the court concluded that the trial court, by submitting "Lester's damages claim for repair costs covered by the class action settlement to the jury for consideration," had improperly permitted relitigation of issues resolved by the class settlement and allowed a special "subclass" to recover twice on the same claim. *Id.* at 1180. We address each of those exceptions in turn.[17]

*Necessary in Aid of Jurisdiction Exception*

[4] The second exception to the Anti-Injunction Act authorizes injunctive relief "to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."[18] *Atlantic Coast Line*, 398 U.S.

---

[17]The dissent suggests that we have "conducted a *de novo* review of the factual findings underlying the district court's decision to issue the injunction under the second exception and substituted [our] judgment for that of the district court." *Post* at 14609. The dissent is only partially correct. As our caselaw explains, we must "review the legal determination of whether the district court had the power to issue an injunction de novo." *Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1102 (9th Cir. 1994). If we are satisfied that the district court had the authority to issue the injunction, we then examine "its decision to exercise that power . . . for an abuse of discretion." *Western Sys.*, 958 F.2d at 867. In this case, we conclude as a matter of law that the district court lacked the power to enjoin the state court proceedings. That is not a matter of discretion.

[18]The dissent views the necessary in aid of jurisdiction exception and the relitigation exception as parallel provisions that authorize an injunction in essentially the same circumstances. *Post* at 14621 ("From a pragmatic standpoint, the basic elements of the two exceptions are essentially the same."). We are not inclined to construe the Anti-Injunction Act in that way, as it would render one of the exceptions redundant and the use of the disjunctive "or" in the statute irrelevant, in violation of the familiar canon that cautions against such a reading. *See, e.g.*, *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988). A distinction between the necessary in aid of jurisdiction exception and the relitigation exception has consistently been recognized in the caselaw. The former exception applies

at 295. This exception "arose from the settled rule that if an action is *in rem*, the court first obtaining jurisdiction over the *res* may proceed without interference from actions in other courts involving the same *res*." *Alton Box*, 682 F.2d at 1272. Although the second exception has since been expanded to include some *in personam* actions, it remains that an injunction is justified only where a parallel state action "threatens to 'render the exercise of the federal court's jurisdiction nugatory.' "[19] *Bennett*, 285 F.3d at 806 (quoting *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 (7th Cir. 1996)). Indeed, the gen-

---

when a parallel state action "threatens to 'render the exercise of the federal court's jurisdiction nugatory.' " *Bennett*, 285 F.3d at 806. The latter exception, which was added in 1948, is used "to prevent state litigation of an issue that previously was presented to and decided by the federal court." *Chick Kam Choo*, 486 U.S. at 147.

The separate treatment of these provisions in the caselaw forces the dissent to concede that the necessary in aid of jurisdiction exception "is generally applied at an earlier stage of the litigation, before the settlement is fully implemented." *Post* at 14621. The dissent suggests that in "many of the cases in which an injunction has been affirmed under the relitigation exception, it has also been affirmed under the 'necessary in aid of jurisdiction' exception." *Id*. at 14621. But the cases cited by the dissent represent exceptions explained by their particular facts. In *Flanagan v. Arnaiz*, 143 F.3d 540 (9th Cir. 1998), for instance, we applied both exceptions because there was both a final settlement agreement (and judgment) and an ongoing action in the form of litigation over an alleged breach of that settlement agreement. *Id*. at 543-44. The validity of an injunction will more often depend on one exception or the other. *Compare In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 233 (3d Cir. 2002) (applying the necessary in aid of jurisdiction exception because the federal action had not reached final judgment), *with Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 639-640 (2d Cir. 1987) (applying the relitigation exception because the federal action had reached final judgment).

[19]The dissent offers an exactly converse definition of the scope of the necessary in aid of jurisdiction exception. According to the dissent, the " 'necessary in aid of jurisdiction' exception is inapplicable *only* when the district court's jurisdiction has been so completely exhausted that the intrusion by a state court on its exercise of its jurisdiction would be meaningless." *Post* at 14624. No authority is cited to support that reading of the caselaw, and we remain bound by precedent.

eral rule is still that "[w]here a suit is strictly *in personam* . . . there is no objection to a subsequent action in another jurisdiction, either before or after judgment, although the same issues are to be tried and determined[,] . . . because [the subsequent action] neither ousts the jurisdiction of the court in which the first suit was brought, nor does it delay or obstruct the exercise of that jurisdiction, nor lead to a conflict of authority where each court acts in accordance with the law."[20] *Kline v. Burke Constr. Co.*, 260 U.S. 226, 232 (1922); *see also Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964).

[5] The necessary in aid of jurisdiction exception is inapplicable here because the state court action did not threaten the district court's jurisdiction over the Inner-Seal Siding litigation. By the time that the court issued the injunction, the Inner-Seal Siding class action had long since been resolved. Indeed, the district court had several years earlier approved the settlement and entered final judgment. Because the litigation was over, the state court action could not have interfered with the district court's consideration or disposition of the class claims. *Cf. Alton Box*, 682 F.2d at 1271. Nor could it have interfered with the court's continuing jurisdiction over the settlement. The membership of the class was fixed, the parties' respective rights and liabilities were resolved, the settlement fund had been established and claims were being

---

[20]According to the dissent, we are mired in the law as it was in 1922 and refuse to accept that the necessary in aid of jurisdiction exception has been used in *in personam* actions. *Post* at 14627. The dissent is mistaken. We acknowledge that the necessary in aid of jurisdiction exception has been applied *in personam* actions, though as a limited exception to the rule. *Supra* at 14580. We also acknowledge that some courts have rationalized the expansion of the necessary in aid of jurisdiction exception by comparing the jurisdiction of a multidistrict court in a complex class action to a *res*. *See, e.g.*, *In re Baldwin-United*, 770 F.2d at 337. We offer no comment on the validity of such a comparison. We simply hold that however one views the class action proceedings in this case, application of the necessary in aid of jurisdiction exception is not supported by established law.

paid. Lester did not seek to join or undo the class, contest the payment of funds to class members or make a claim on the settlement fund. Although the state court litigation arose from the same facts as the class action, an "injunction cannot issue to restrain a state court action" simply because it involves "the same subject matter at issue before the federal court." *Id.* at 1272; *accord Bennett*, 285 F.3d at 807. Instead, an injunction is "necessary in aid of" the court's jurisdiction only when it is required to preserve the court's jurisdiction. *See Atlantic Coast Line*, 398 U.S. at 295; *Bennett*, 285 F.3d at 806-07. Because the state court action did not seriously impair the district court's flexibility and authority to decide the Inner-Seal Siding litigation or enforce the settlement agreement, an injunction was not necessary to preserve the court's jurisdiction. *See, e.g.*, *Alton Box*, 682 F.2d at 1271-73.

The authority cited by the district court, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998), is not to the contrary.[21] In *Hanlon*, we upheld an injunction barring a federal class member from pursuing a state class action involving claims that were similar to those raised in a nationwide class action that was nearing resolution. 150 F.3d at 1025. The controversy in that case arose when various lawsuits were consoli-

---

[21]The district court also quoted extensively from the Second Circuit's decision in *In re "Agent Orange" Product Liability Litigation*, 996 F.2d 1425 (2d Cir. 1993). In that case, the court held that "[a] district court, in exceptional circumstances may use its All Writs authority to remove an otherwise unremovable state court case in order to 'effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.' " 996 F.2d at 1431 (quoting *United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977)). As noted by the district court in its order, the Supreme Court in *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28 (2002) held that the removal statute "requires that a federal court have original jurisdiction over an action in order for it to be removed from a state court. The All Writs Act, alone or in combination with the existence of ancillary jurisdiction in a federal court, is not a substitute for that requirement." 537 U.S. at 34. Accordingly, the *In re "Agent Orange"* rule, which was never adopted by this Circuit, is no longer instructive.

dated into one nationwide class action. *Id.* at 1018. Shortly thereafter, a preliminary settlement agreement was approved and notice was made to class members. *Id.* To protect the settlement process, the district court ordered that "[p]ending final determination . . . of the settlement[,] . . . no member of the Settlement Class . . . shall commence [a lawsuit involving] . . . any of the claims described in the . . . Settlement Agreement." *Id.* In contravention of that order, a disaffected class member filed a state class action, through which he sought to represent himself and all similarly situated residents of the state. *Id.* at 1018-19. The district court enjoined the state proceedings. *Id.* at 1019.

We affirmed. We concluded that a temporary stay pending settlement of the nationwide class action was appropriate under the All Writs Act and the Anti-Injunction Act because concurrent state proceedings at such a sensitive stage in the federal proceedings would have threatened the jurisdiction of the district court. *Id.* at 1025. Although *Hanlon* did not elaborate, the decision clearly recognized that a competing state class action covering a portion of the federal class posed a significant danger to the delicate and transitory process of approving a settlement agreement, and thereby threatened the district court's ability to resolve the litigation.[22]

---

[22]In this way, *Hanlon* tracks the Third Circuit's decision in *In re Diet Drugs*, in which the court affirmed an order enjoining a parallel state action. Our dissenting colleague relies on *In re Diet Drugs* for the proposition that the complexities of a nationwide class action justify application of the necessary in aid of jurisdiction exception. *Post* at 14626-27. The dissent overlooks one critical aspect of *In re Diet Drugs*, however. In that case, as in *Hanlon*, the federal nationwide class action was nearing settlement at the time the state action was filed. 282 F.3d at 237. In light of the sensitive stage of the federal litigation, the Third Circuit reasoned that the state court action "might interfere with the District Court's oversight of the settlement at that time, given the careful balancing it embodied" and, therefore, posed "a serious threat to the District Court's ability to manage the final stages of this complex litigation." 282 F.3d at 236-37. Here, the prior (not parallel) federal class action resulted in a settlement and final judgment nearly four years before Lester filed the state action and over six years before the jury returned its verdict.

**[6]** We are not presented with similar concerns. Lester was not a class member and did not seek to represent class members. Nor was the federal litigation at a sensitive stage in the process. The membership of the Inner-Seal Siding class and the terms of the settlement were approved and finalized long before the district court issued the injunction. Final judgment had been entered. There was nothing more for the district court to do in the class action, save to ensure that the terms of the settlement agreement were followed.[23] The state court

---

[23]The dissent contends that the federal class action remained active and that to reach a contrary result we have improperly "disagree[d] with the district court's statement of the relevant facts" and made "erroneous findings of fact" on appeal. *Post* at 14623 & 14624. Two of the three "facts" that we assertedly ignore, however—that allowing Lester to collect on its repair cost claim will lead to double recovery for some class members and cause other distributors to seek damages "on behalf of customers," *post* at 14622—are not factual findings. The first is a legal conclusion and the second is speculation, which the district court failed to connect to the evidence before it or to the fact of how that would threaten its jurisdiction. We do not owe deference to such matters.

Furthermore, the dissent is mistaken about the relevance of L-P's decision to fund claims and the possible effect of the state court action on that decision. By the time the district court enjoined the state proceedings, L-P had already agreed to fund the remaining claims through the seventh year. The sole question was whether L-P would make the "final funding" obligation, which would last until all outstanding claims were paid. *See In re Inner Seal Siding Litigation*, 234 F. Supp. 2d at 1172-73. L-P, after the state jury verdict, answered that question and elected to fund all remaining claims. Accordingly, the jury verdict only had the potential to influence L-P's final funding decision and, ultimately, did not even affect that issue. Moreover, even if L-P's decision to fund the remaining claims had been influenced by the state court action, the requisite threat to the jurisdiction of the district court would still have been lacking. If L-P elected to fund the remaining claims (as it did), the claims administrator would continue paying approved claims. On the other hand, if L-P elected not to fund the additional claims, members whose claims remained unsatisfied would be able to "pursue [any available] legal remedies." *Id.* This process of evaluation and reelection to continue funding was agreed to long before Lester brought the state court action. The parties knew that at some point L-P might decide not to fund the remaining claims. The coming to pass of a result that the parties themselves contemplated and provided for in their agreement cannot legitimately be called a threat to the district court's jurisdiction.

action could not threaten the court's jurisdiction over that process. Accordingly, the injunction cannot be sustained under the necessary in aid of jurisdiction exception.

The dissent maintains that our holding "disregards the provision of the settlement agreement and the district court order expressly retaining 'exclusive and continuing' jurisdiction over the enforcement of the settlement agreement." *Post* at 14625. Relying on our decision in *Flanagan v. Arnaiz*, the dissent suggests that "inclusion of such a provision . . . provides a sufficient basis for the invocation of the 'necessary in aid of jurisdiction' exception." *Id.* We are not persuaded that *Flanagan* stands for such a broad proposition. We agree with the dissent that the "exclusive and continuing" jurisdiction provision is important in the sense that without it (and the authority conveyed by the All Writs Act), the district court would have lacked subject matter jurisdiction over L-P's motion to enforce the settlement agreement. *See supra* at 14575-77. But that provision, standing alone, does not allow the district court to enjoin any proceeding it wants to enjoin. The power to halt a state proceeding is circumscribed by the Ant-Injunction Act. The necessary in aid of jurisdiction exception to that Act authorizes injunctive relief only when the "federal court's flexibility and authority to decide [a] case" is "seriously impaired" by a parallel state court proceeding. *Atlantic Coast Line*, 398 U.S. at 295.

This limitation is actually illustrated by *Flanagan*, in which we upheld an order permanently barring the plaintiffs from pursuing a state court action for breach of a prior settlement agreement. The issue in *Flanagan* arose when the plaintiffs settled a federal lawsuit against the defendants. 143 F.3d at 542. The settlement agreement effectively provided that the district court would retain exclusive jurisdiction for the purpose of resolving future disputes between the parties. *Id.* at 543. Less than a year after executing the settlement agreement, however, the plaintiffs filed a state court action against the same defendants for breach of the settlement agreement.

*Id.* The state court stayed the proceedings, and the plaintiffs litigated their claims in the district court and on appeal to this Court. *Id.* The plaintiffs lost on all but one count. *Id.* That claim was set for trial. *Id.* With discovery underway in the federal proceeding and a trial date set, the plaintiffs asked the state court to lift the stay. *Id.* Understandably exasperated, the district court enjoined the plaintiffs from pursuing the stayed action or any other state court action alleging a breach of the settlement agreement. *Id.* at 543-44.

We affirmed. We observed that the plaintiffs had engaged in "an entirely unjustified attempt . . . to evade their own agreement, incorporated in a court order and judgment, to submit disputes and enforcement proceedings regarding their settlement to the federal district court." *Id.* at 546. Because the plaintiffs had agreed to maintain exclusive jurisdiction in federal court and their concurrent state court action threatened the district court's jurisdiction over a ongoing case in which they were also parties, we held that the Anti-Injunction Act did not bar the stay. *Id.*

Unlike the vexatious litigants in *Flanagan*, Lester did not agree to retain exclusive jurisdiction in the district court. More importantly, the federal lawsuit was not winding its way to trial when the injunction was issued. Rather, the class action had achieved final judgment status more than six years before the jury returned a verdict in the Minnesota state case. The absence of an actual threat to an ongoing case renders the analogy to *Flanagan* unsound.

### *Relitigation Exception*

**[7]** The third exception to the Anti-Injunction Act, the so-called relitigation exception, permits a federal court to enjoin state proceedings when necessary "to protect or effectuate its judgments." 28 U.S.C. § 2283. This power "allows federal courts to . . . protect the res judicata effect of their judgments and prevent the harassment of . . . federal litigants through

repetitious state litigation." *Amwest Mortgage Corp. v. Grady*, 925 F.2d 1162, 1164 (9th Cir. 1991) (citation and internal quotation marks omitted). Because the relitigation exception is "founded in the well-recognized concepts of res judicata and collateral estoppel," *Chick Kam Choo*, 486 U.S. at 147-48, the "requirements of identity of the parties, . . . adequate notice, and adequate representation apply," *Frank v. United Airlines, Inc.*, 216 F.3d 845, 853 (9th Cir. 2000). In addition, an "essential prerequisite . . . is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." *Chick Kam Choo*, 486 U.S. at 147-48. This "prerequisite is strict and narrow." *Id.* at 148. Accordingly, a subsequent action may be barred only when "it arises from the same 'transaction, or series of transactions' as the original action [and w]hether two events are part of the same transaction or series depends on whether they are related to the same set of facts and whether they could conveniently be tried together." *Western Sys.*, 958 F.2d at 871 (quoting Restatement (Second) of Judgments § 24(1), (2)). Rigorous application of res judicata principles ensures that the party sought to be precluded by the prior resolution of a claim or issue enjoyed a " 'full and fair opportunity' to litigate . . . in the earlier case." *Amwest Mortgage*, 925 F.2d at 1164-65 (quoting *Allen v. McCurry*, 449 U.S. 90, 95 (1980)).

[8] The relitigation exception is inapplicable here because the Minnesota lawsuit did not challenge the res judicata effect of the class settlement. Significantly, Lester was not named as a party to the class action and was not a member of the nationwide class.[24] *Cf. Drelles v. Metro. Life Ins. Co.*, 357

---

[24]The dissent attaches no legal significance to the fact that Lester was not a party to the class action. *Post* at 14610 & 14616-17. The relevance of that fact is difficult to avoid. The relitigation exception is "founded in the well-recognized concepts of res judicata and collateral estoppel." *Chick Kam Choo*, 486 U.S. at 147-48. Central to the concepts of res judicata and collateral estoppel is the principle that only parties to a prior

F.3d 344, 346-47 (3d Cir. 2003); *Frank*, 216 F.3d at 852-853. Nor were Lester's interests sufficiently parallel to the class members' interests such that privity could be implied.[25] *Cf.*

action and parties in privity with parties to a prior action are barred from relitigating claims or issues in a subsequent action. *Tahoe-Sierra Pres. Council, Inv. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003); *Frank*, 216 F.3d at 853. Thus, the fact that Lester was not a party to the prior action leaves only the possibility of privity with class members as a basis for applying the relitigation exception. *See, e.g.*, *Amalgamated Sugar*, 825 F.2d at 640.

[25]Relying on our decision in *Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996), the dissent contends that Lester and its class member customers were in "virtual" privity because Lester, "[i]n essence, . . . sought to serve as a conduit for its customers by obtaining additional damages on their behalf." *Post* at 14619. We disagree. In *Trevino*, we found sufficient privity of interest between a child and her grandmother with respect to the narrow issue of the amount of punitive damages to be awarded for the wrongful death of the child's father because the issues and the interests of the parties in the separate actions were "identical" and the child and her grandmother enjoyed "a familial relationship," which was "an important factor" in finding privity. 99 F.3d at 923-34. *Trevino* is readily distinguishable. For starters, there was no familial or legal relationship, express or implied, between Lester and its class member customers, and Lester did not control the class members in the prior action or succeed to the class members' interests. Moreover, Lester's interests and the interests of its class-member customers were similar only in the limited sense that both Lester and its customers wanted the buildings constructed with Inner-Seal Siding to be repaired. *Cf. Kerr-McGee Chem.*, 816 F.2d at 1180-81. According to Lester, however, moral obligations and business realities compelled it to repair the damaged buildings with or without compensation from L-P. Lester was also motivated to repair the defective siding by a desire to rehabilitate its tarnished image and rebuild its goodwill. From Lester's perspective, then, the repair costs claim was far more about making itself whole than reimbursing customers. *Cf. Frank*, 216 F.3d 852-53; *Kerr-McGee Chem.*, 816 F.2d at 1180-81. Lester's financial and image-related concerns were obviously not represented by the class members in the prior action. *Cf. Frank*, 216 F.3d 852-53; *Kerr-McGee Chem.*, 816 F.2d at 1180-81. Finally, the issues litigated in the two actions are not "identical." In the federal action, the class members sued and recovered for their injuries, while Lester, in the state court action, sued and recovered for its injuries. The mere fact that both injuries have the same root—defective Inner-Seal Siding—does not mean that both issues are identical.

*Kerr-McGee Chem. Corp. v. Hartigan*, 816 F.2d 1177, 1180-81 (7th Cir. 1987). As a general rule, "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). For that reason, "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings."[26] *Id.* (quoting *Martin v. Wilks*, 490 U.S. 755, 762 (1989)). As a stranger to the class proceedings and settlement and lacking privity with class members, Lester was entitled to sue L-P in state court for its own injuries. *See id.*; *Drelles*, 357 F.3d at 346-47; *De Cosme v. Sea Containers, Ltd.*, 874 F.2d 66, 68 (1st Cir. 1989); *Alton Box*, 682 F.2d at 1273.

L-P concedes that Lester was not precluded from litigating all claims related to the failure of Inner-Seal Siding. Nevertheless, L-P contends that the issue of damages for costs related to the repair of Inner-Seal Siding was litigated to finality in the class action and released by the settlement agreement. L-P reaches this conclusion by assuming that Lester, in bringing the repair cost claim, acted as a representative of its class member customers. By litigating injuries to its custom-

---

[26]The dissent relies on the Second Circuit's decision in *In re Baldwin-United* for the proposition that a nonparty can be bound by a prior judgment, even if it was not in privity with a party to the earlier action and did not have an opportunity to litigate its claims or seek redress for its injuries. *Post* at 14614 & 14616-18. Although we do not read *In re Baldwin-United* as announcing such a sweeping rule, we need not recount that opinion in detail. The short rebuttal is that the Anti-Injunction Act was not at issue in *In re Baldwin-United*. The parties to that action conceded that "the Anti-Injunction Act [was] inapplicable . . . since the injunction below was issued before any suits were commenced in state court." 770 F.2d at 335. Although the court looked to caselaw interpreting the Anti-Injunction Act for guidance, it was not constrained by the strict requirements of the relitigation exception. We are not so unconstrained. *See, e.g.*, *Atlantic Coast Line*, 398 U.S. at 287 (explaining that the exceptions provided in the Anti-Injunction Act should not "be enlarged by loose statutory construction").

ers on behalf of its customers, so the argument goes, Lester should be treated like a class member for collateral estoppel purposes and precluded, as they would be, by the prior resolution of their claims.

**[9]** According to the state trial court, however, the prayer for repair costs presented a cognizable state law claim belonging to Lester. As the distributor of a defective product, the trial court reasoned that Lester was entitled to recover the costs it would incur to make its customers whole. *See, e.g.*, *DeGidio v. Ace Eng'g Co.*, 225 N.W.2d 217, 223 (Minn. 1974). Because the repair cost claim sought recovery of Lester's damages, albeit voluntary and future damages, Lester was not acting as a representative of its customers seeking to recover on behalf of its customers. The claim was instead entirely personal to Lester. That claim could not have been resolved in the class action together with the class claims because Lester was neither a party to the class action nor represented by a party to the class action. *See Western Sys.*, 958 F.2d at 871-72; *Amwest Mortgage*, 925 F.2d at 1164-65; *De Cosme*, 874 F.2d at 68; *Alton Box*, 682 F.2d at 1273. Because Lester did not have a "full and fair opportunity" to litigate its repair costs claim in the class action, that claim was not adjudicated and released by the class settlement. *See Drelles*, 357 F.3d at 346-47; *De Cosme*, 874 F.2d at 68; *Alton Box*, 682 F.2d at 1273; *cf. Chick Kam Choo*, 486 U.S. at 149; *Amwest Mortgage*, 925 F.2d at 1164-65. With an essential element of the relitigation exception lacking, the district court had no authority to enter the injunction. *See Martin v. Wilks*, 490 U.S. 775, 762 (1989); *Chick Kam Choo*, 486 U.S. at 149; *Drelles*, 357 F.3d at 346-47; *Amwest Mortgage*, 925 F.2d at 1165; *Cratsenberg v. Owners of NW 20 Real Estate (In re Federal Shopping Way, Inc.)*, 717 F.2d 1264, 1270-71 (9th Cir. 1983); *Alton Box*, 682 F.2d at 1273.

The district court's invocation of the relitigation exception was improper for the additional reason that any potential for relitigation of covered claims was addressed by the trial

court's instructions to the jury. Specifically, the trial court instructed the jury that Lester could not be awarded damages for injuries that were covered by the settlement. This instruction essentially gave L-P the legal ruling it sought and did not itself conflict with the federal court settlement.[27]

L-P was no doubt disappointed by the verdict returned. Whether Lester had adequately proven its claims presented a question of fact, however. The trial court left it to the jury, as the finder of fact, to assess damages according to detailed instructions. It is not the province of the district court in Oregon to say that the trial court and jury in Minnesota were wrong in their respective determinations. The proper recourse for L-P was to appeal through the state court system and, if necessary, to petition the United States Supreme Court for review. *See Parsons Steel Inc. v. First Alabama Bank*, 474 U.S. 518, 525-26 (1986); *Atlantic Coast Line*, 398 U.S. at

---

[27]There may be some tension between the trial court's conclusion that state law allowed Lester to recover for repair costs and the instruction barring the recovery of such damages if the buildings involved were covered by the class settlement. If so, that is a matter for the state courts to resolve. It remains that the trial court instructed the jury that Lester's repair costs claim was barred under the settlement unless the building at issue had been constructed after January 1, 1996, has or may have a siding performance failure after January 1, 2003, or was one for which claims would be submitted prior to January 1, 2003 but not paid by the settlement fund. These imitations were derived from the class action settlement itself.

Similarly, while it may be difficult to reconcile the jury instructions and the verdict that none of the repair costs were barred by the settlement, we are not in a position to second guess the findings of the state court jury. On that subject, the trial court held that "both sides presented evidence as to what they believed [the] damage[s] for Inner-Seal should be. After a three-week trial, the jury returned a finding of damages in the total amount of $29.6 million which is supported by the evidence presented and this Court sees no reason to disturb the finding of the jury." Though that explanation may not seem very persuasive or be very satisfying, we are not in a position to second-guess the Minnesota trial judge on the subject, either. Presumably that issue could be taken up with Minnesota's appellate courts.

296; *cf. Drelles*, 357 F.3d at 346-47. "[L]ower federal courts possess no power whatever to sit in direct review of state court decisions." *Atlantic Coast Line*, 398 U.S. at 296. Indeed, "the highly intrusive remedy of a federal-court injunction against the enforcement of [a] state-court judgment" is not justified even where a state court mistakenly rejects the res judicata effect of a prior federal judgment. *Parsons*, 474 U.S. at 525. Instead, "[c]hallenges to the correctness of the state court's determination as to the conclusive effect of a federal judgment must be pursued by way of appeal through the state-court system and certiorari from . . . [the Supreme] Court." *Id.*; *accord Chick Kam Choo*, 486 U.S. at 146.

L-P, of course, did appeal the verdict and certain rulings by the trial court through the state system. Hedging its bets, L-P also sought a federal injunction during the brief interval between the return of the jury verdict and entry of judgment. The district court agreed with L-P that Minnesota law did not permit Lester to recover the costs to repair Inner-Seal Siding and that the trial court had erred in submitting such a claim to the jury. That ruling was tantamount to a judgment reversing a state court on a matter of state law. *Cf. Atlantic Coast Line*, 398 U.S. at 293. Lower federal courts enjoy no such power. *Parsons*, 474 U.S. at 525-26. It is the sole responsibility of the state courts to determine whether state law allows a particular claim in a given dispute. *See Erie v. Tompkins*, 304 U.S. 64, 78 (1938). In failing to appreciate the state court's right to decide issues of state law, the district court exacerbated the inherent conflict between federal and state courts.[28] *See Chick Kam Choo*, 486 U.S. at 146. Indeed,

---

[28]According to the dissent, "whether or not Lester had a 'cognizable state law claim' is inconsequential," because "[t]he jury awarded damages for the very same repair costs previously provided for in the settlement agreement and district court order." *Post* at 14612-13. The error in the dissent's premise is similar to the mistake made by the district court when it concluded, contrary to the decision of the state trial court, that Minnesota law did not allow Lester to recover repair costs if its customers were mem-

allowing L-P to lose on the merits in state court, yet run to federal court for an injunction just days before the state court decision achieved preclusive status, offends the very "principles of equity, comity, and federalism" that undergird the Anti-Injunction Act.[29] *See Parsons*, 474 U.S. at 526; *Ramsden*, 214 F.3d at 870-71.

---

bers of the settlement class. *In Re Louisiana-Pacific*, 234 F. Supp. at 177 ("I have studied [the cases cited by Lester and relied on by the state court] carefully and find them to be readily distinguishable and thus not controlling."); *id.* at 1180 ("[T]he Minnesota state court was wrong to submit Lester's damages claim for repair costs covered by the class action settlement to the jury for consideration."). While the dissent is far more thoughtful in its expression than the district court, the central premise is the same: the state trial court's ruling and state jury's verdict notwithstanding, Lester was not actually litigating claims for its own injuries; it was litigating claims for its customers' injuries. The difficulty with that premise is that the trial court held that Minnesota law recognized Lester's repair costs claim, and the jury returned a verdict stating that Lester, as a matter of state law, was entitled to the damages awarded. If we are to take seriously the rule that we do not sit in review of state court determinations, *see, e.g.*, *Parsons*, 474 U.S. at 525-26, we must accept that Lester was not acting as a representative of its customers or as a conduit funneling money to its customers. We must accept that Lester was acting as a business, injured by LP and seeking to be made whole through its own claims for its own future damages, and that its damages were proven to the satisfaction of the jury. Perhaps the state trial court and jury were wrong in their respective determinations. A federal court, however, either explicitly as in the district court order or implicitly as in the dissent, is not in a position to say so.

In allowing the state court to resolve issues of state law for itself, we do not, as the dissent implies, disclaim our obligation to evaluate the propriety of the injunction ourselves. If we believed the issue in this case was as straightforward as the dissent suggests, we may well have come to a different conclusion.

[29]Although the trial court's rulings and the verdict had not been reduced to a final judgment, the underlying issues, including the effect of the settlement agreement and the availability of repair costs, had been resolved by the trial court. *Cf. Ramsden v. AgriBank, FCB*, 214 F.3d 865, 869-70 (7th Cir. 2000); *De Cosme*, 874 F.2d at 68-69. At some point, federal courts must accept that a state court action has progressed too far to warrant intervention, even if a technical prerequisite to final judgment remains. *See Ramsden*, 214 F.3d at 870-71.

The case relied by on the district court, *Flanagan v. Arnaiz*, is not to the contrary. As discussed, *Flanagan* involved both a settlement agreement (and final judgment) and ongoing federal litigation for an alleged breach of that agreement. 143 F.3d at 543. As the dispute over the settlement agreement made its way to trial, the plaintiffs in the federal litigation asked a state court to resolve their breach of settlement agreement claim. *Id.* The district court ended their efforts. *Id.* at 544. We upheld the injunction under the relitigation exception because the first action had been decided in federal court and the parties had expressly agreed to maintain exclusive jurisdiction in federal court. *Id.* 546. The final judgment of a federal court and the accompanying settlement agreement were therefore threatened by a subsequent state court action that was brought by the very parties to the prior judgment. *See id.*

In contrast to the facts of *Flanagan*, Lester was not a party to the settlement agreement and was not bound by the provision placing exclusive authority in the district court. Moreover, the Minnesota action did not arise from the settlement agreement itself. Rather, Lester brought claims for its own injuries in the court of its choice, as it was entitled to do. A federal court does not have the power to prevent a plaintiff from pursuing a state law claim simply because that claim shares a common factual background with a claim litigated in an earlier case. There must be, as there was in *Flanagan*, the requisite nexus between the parties and claims or issues litigated in the first action and the parties and claims or issues sought to be precluded in the second action.[30]

---

[30]The cases cited by L-P are easily distinguishable. In the only binding precedent cited, *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992), we upheld an anti-suit provision in a class action settlement agreement against attack by a group of settlement beneficiaries that had not individually approved the agreement because we determined that they were in privity with and adequately represented by their trustee, who had been a party to the settlement and was authorized to act for the beneficiaries. 955 F.2d at 1277-79. We reasoned that the Anti-Injunction Act did

**[10]** The dissent expresses fear that our holding will "severely limit[ ] the authority of district courts to protect [their] jurisdiction and to preserve [their] settlement agreements . . . [and] render[ ] federal court orders and judgments vulnerable to further litigation in state courts." *Post* at 14604. Even if the dissent's concerns were valid, the authority of federal courts is not unlimited. In any event, we do not perceive such broad dangers. We recognize that others in Lester's position, encouraged by the jury verdict, may pursue similar claims if the laws of their respective states so allow and if the respective statutes of limitations have not expired. But a release of claims by distributors was not a benefit that L-P bargained for in the settlement agreement. We simply hold that a plaintiff, who was not a party or in privity with a party to a prior federal action and who asserts claims that were not resolved in the prior action, is not precluded from litigating its state law claims in state court. This holding is entirely consonant with established law and faithfully allows the settlement agreement to shape the scope of our ruling: parties who agreed to the settlement and released their claims remain bound. On the other

---

not bar the anti-suit provision because the district court was empowered to protect the settlement from attack by parties and parties in privity with parties to the settlement agreement. *See id.*

In contrast to *Class Plaintiffs*, the class members in the underlying action were not in privity with Lester and did not adequately represent Lester's interests. Thus, Lester was not bound by the settlement. If Lester was not bound by the settlement, it follows that Lester's state law claims were not foreclosed by the settlement, even if those claims rested on some of the same facts involved in the class action.

The nonjurisdictional cases cited by L-P are of comparably little support. *See In re Prudential Ins. Co.*, 261 F.3d 355, 366-68 (3d Cir. 2001) (holding that a class settlement could bar future claims by class members, even though those claims were not raised by the class members in the original action); *In re Baldwin-United*, 770 F.2d at 335 (observing that "the parties agree that the Anti-Injunction Act is inapplicable here since the injunction below was issued before any suits were commenced in state court").

hand, claimants like Lester, class plaintiffs who opted out of the settlement or the plaintiffs in the class action in Florida, who were never part of the underlying action, may litigate their claims in accordance with the laws of their respective states.[31]

## V.   Conclusion

[11] For the foregoing reasons, the order enjoining the Minnesota court from entering judgment on the $11.2 million in damages awarded to Lester for repair costs violates the Anti-Injunction Act. The injunction is vacated.

**REVERSED.**

---

[31]We should not lose perspective. The contested portion of the award is limited to the narrow issue of recovery for repair and replacement costs. L-P concedes, at least on appeal, that Lester had the right to bring its other claims. Nor should we assume that the Minnesota appellate courts will fail to correct errors, if any, that occurred in the trial court. "[A] federal court does not have inherent power to ignore the limitations of [the Anti-Injunction Act] and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area pre-empted by federal law, even when the interference is unmistakably clear." *Atlantic Coast Line*, 398 U.S. at 294. Accordingly, the "state proceedings 'should normally be allowed to continued unimpaired by intervention of the lower federal courts, with relief from error, if any through the state appellate courts and ultimately, [the Supreme] Court.' " *Choo*, 486 U.S. at 146 (quoting *Atlantic Coast Line*, 398 U.S. at 287). That avenue remains open to L-P.

SILVERMAN, Circuit Judge, concurring:

I agree that the Anti-Injunction Act prohibits the injunction that the district court entered in this case. I write separately because I do not believe that we should address the merits of L-P's res judicata defense. Having elected to assert that defense in the state trial court, L-P cannot come running to federal court to enjoin the state proceedings the moment it gets a verdict that is not to its liking. If L-P is unhappy with the result of its state court trial, it must take that up with the Minnesota appellate courts. It cannot have it both ways — litigate in state court and hope for a win, but obtain a federal injunction of the state proceedings when it loses. To put it another way, what happens in state court stays in state court.

When Lester sued L-P in Minnesota state court, L-P immediately could have moved for an injunction in the district court. Instead, it asserted res judicata in the state court, arguing that the settlement agreement between L-P and a nationwide class of building owners precluded some or all of Lester's claims. That turned out to be a good decision, at least up until the time that the jury rendered its verdict. Until then, L-P had succeeded in persuading the trial court to issue jury instructions that barred Lester from recovering damages for work it performed for class members who had already received settlement proceeds, even though the trial court had previously ruled that Minnesota law permitted Lester to assert claims against L-P independent of the building owners' claims. So far, so good.

Then, things went sour for L-P. The jury awarded $13.2 million for costs to repair buildings that were not covered by the federal class action, and also decided that same amount would compensate Lester for its costs to repair all buildings, including those covered by the class action. In other words, the jury concluded that every repair for which Lester sought damages was performed on a building not covered by the settlement agreement, despite expert testimony that none of Lester's customers had opted out of the class and that $640,000 had been paid to them from the settlement fund. Unhappy with what it perceived as a double recovery for some class members, L-P ran to district court and sought to enjoin the state court proceedings. At that point, however, it was too late. In my view, once L-P raised its res judicata defense in state court and that court ruled on it, the interests of comity outweighed the district court's perceived need to prevent possible relitigation of its judgment.

In *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 524-25 (1986), the Supreme Court held that once a state court rules on the preclusive effect of a prior federal court judgment, a federal court considering enjoining the state court proceedings must first "look to that state's law of judgments to determine whether another court of that state would view the res judicata ruling as final and binding." The Court rejected the idea that, notwithstanding the Full Faith and Credit Act, the Anti-Injunction Act "empowers a federal court to be the final adjudicator as to the res judicata effects of its prior judgments on a subsequent state action." *Id.* at 522 (internal quotation marks omitted). Because of the "important values of federalism and comity embodied in the Full Faith and Credit Act," the Court limited the relitigation exception to the Anti-Injunction Act to those situations in which the state court *has not yet ruled* on the merits of the res judicata issue. *Id.* at 524 ("Once the state court has finally rejected a claim of res judicata, then the Full Faith and Credit Act becomes applicable. . . .").

*Ramsden v. Agribank*, 214 F.3d 865 (7th Cir. 2000), dealt with a similar issue: the propriety of enjoining state court proceedings where the state court rules that a prior federal judgment does not bar the claim at issue, but state law would *not* give preclusive effect to that ruling. The Ramsdens sued Agribank and Hass, an employee of Agribank, alleging tortious conduct in the sale of farm property. While the Ramsdens appealed the state court's dismissal of Hass, they filed a second state court action against Agribank alone, which was removed to federal district court. The district court dismissed the action on the merits. On remand in state court, Hass unsuccessfully moved for summary judgment based on the preclusive effect of the federal court ruling. Agribank (whose counsel also represented Hass) then returned to federal court and obtained an injunction that barred the state court from further considering any issues between the parties relating to the purchase.

The Seventh Circuit vacated the injunction. Initially, it noted that, although Wisconsin courts would not consider the state court's denial of summary judgment as sufficiently final to warrant preclusion, that did not mean the district court was right to invoke the relitigation exception. *Id.* at 869 ("[J]ust because a federal court has the statutory power to enjoin a state court proceeding does not mean that it should exercise that authority."). Instead, in light of the comity concerns in *Parsons Steel*, the Seventh Circuit held that:

> Once a state court considers a res judicata defense and rules that a prior federal judgment does not actually bar a claim, the affront of federal court intervention stripping the state court of power to continue is greatly magnified. After such a ruling, the interests in preventing possible relitigation are therefore generally outweighed by the heightened comity concerns except in the most extraordinary circumstances.

*Id.* at 870-71. Restricting the district court's discretion in that manner was necessary to "prevent the relitigation exception from simply being turned into a vehicle for seeking appellate review of a state court decision in federal court." *Id*. at 872.

I agree with the reasoning of the Seventh Circuit and would adopt its holding here. In state court, L-P asserted res judicata in its motions for summary judgment, directed verdict and judgment notwithstanding the verdict, and during its case in chief, presented extensive testimony about the settlement agreement and its effect on Lester's claims. L-P cannot legitimately contend that it did not have a full and fair opportunity to litigate the res judicata issue. Also, there is no question that the trial court squarely addressed the issue multiple times. That should end a federal court's inquiry.[1] Following *Ramsden*, we do not have to decide whether L-P's res judicata defense has any merit, in particular the complicated issues of privity and virtual privity. The matter is now in the hands of the Minnesota appellate courts.

It would be tempting to conclude that the jury's apparent confusion over the district court's instructions not to award damages for buildings covered by the settlement agreement was an unforeseeable occurrence, entitling L-P to a mulligan in federal court. As Judge Clifton points out, however, L-P will have the opportunity in the Minnesota appellate courts to seek correction of any errors in the verdict. *See Ramsden*, 214 F.3d at 872 (noting that defendants "would still have an opportunity to appeal the state trial court's decision up through the state appeals process"). Having chosen the forum

---

[1]Referring to the fact that L-P moved for an injunction just before final judgment was entered in state court, Judge Clifton cites to *Ramsden* and states that "[a]t some point, federal courts must accept that a state court action has progressed too far to warrant intervention, even if a technical prerequisite to final judgment remains." I believe a state court action reaches that point of no return when the state court rules on the res judicata issue, as the Minnesota trial court did here, regardless of whether a final judgment has been entered.

in which to assert res judicata, L-P cannot now abandon the state review process and seek federal court intrusion, even if the jury (or the trial court) got it wrong. *See Parsons Steel*, 474 U.S. at 525 ("Even if the state court mistakenly rejected respondents' claim of res judicata, this does not justify the highly intrusive remedy of a federal-court injunction against the enforcement of the state-court judgment."). Indeed, in affirming a district court's denial of a request to enjoin state court proceedings, we have recognized that "state courts are just as capable as federal courts in applying applicable law." *Merle Norman Cosmetics, Inc. v. Victa*, 936 F.2d 466, 468 (9th Cir. 1991) ("nothing prevented Merle Norman from raising its defenses of res judicata and collateral estoppel in the California courts").

I agree with Judge Clifton that the district court abused its discretion in issuing the injunction under the "necessary in aid of jurisdiction" exception to the Anti-Injunction Act. It is worth noting that, aside from its concerns that the trial court's instructions confused the jury and led to a subclass of class members who "enjoy special treatment not available to other class members" — an issue which, as I explain above, now belongs in the Minnesota appellate courts — the only reason that the district court offered for the injunction was that there was a "substantial risk that others in Lester's position, encouraged by the jury verdict, will pursue similar claims." While we typically defer to a district court's determination that it must act to protect its jurisdiction in a pending class action, *see Blalock Eddy Ranch v. MCI Telecomm. Corp.*, 982 F.2d 371, 375 (9th Cir. 1992), I fail to see how the district court's speculation about future lawsuits complies with the Anti-Injunction Act. *See Bechtel Petroleum, Inc. v. Webster*, 796 F.2d 252, 253-54 (9th Cir. 1986) (requiring "a strong and unequivocal showing" that a federal injunction is necessary).

In fact, the threat of other lawsuits is not extraordinary at all. In any class action culminating in a global settlement agreement, there is always the chance that absent class mem-

bers will break from the ranks and file separate actions elsewhere, driving up the defendant's litigation expenses. Of course, res judicata will always be an available defense to such actions, perhaps even warranting a prompt dismissal. As previously noted, when such actions arise a party must decide whether to assert res judicata in the state court or return to federal court and seek an injunction. All we need to hold here is that once the party chooses to litigate its res judicata defense in a state forum and that court rules on the issue, the Anti-Injunction Act prevents its relitigation in federal court.

---

REINHARDT, Circuit Judge, dissenting:

At a time when Congress is expanding the jurisdiction of the federal courts over national class-action lawsuits, *see* 28 U.S.C. § 1332(d), the majority's decision severely limits the authority of district courts to protect that jurisdiction and to preserve the settlement agreements they have authorized. It renders federal court orders and judgments vulnerable to further litigation in state courts on a state-by-state basis, litigation that can reopen what are intended to be final damage awards and undermine the orderly implementation of complex national settlement agreements. Further, it allows parties and third parties alike to circumvent federal class-action orders by relying on state law claims that contravene the specific provisions of such orders.

The specific question is whether a federal court may enjoin entry of a final judgment by a state court when the state court jury awards damages that are barred by a federal court settlement agreement and the district court order and judgment adopting it. There is no dispute that if one of Lester's customers had sued Louisiana-Pacific in a Minnesota state court seeking the recovery of funds to make repairs covered by the settlement agreement, an injunction would have been appropriate. The only difference between that case and the one

before us is that Lester's customers did not sue Louisiana-Pacific directly. Instead, the action was filed by Lester which sought to recover funds from Louisiana-Pacific on its customers' behalf and for their benefit. Lester assured the jury that the funds would be used to make repairs to the customers' buildings, the very same repairs for which funds are provided to those same customers under the settlement agreement. The majority views the difference in plaintiffs as dispositive. I view it as immaterial. In effect, the majority condones a double recovery by a sub-group of class members in direct contravention of the settlement agreement and encourages the proliferation of similar sub-groups and similar lawsuits in other states. In light of these circumstances, it is difficult to comprehend why the majority concludes that the district court erred when it enjoined the Minnesota state court from entering judgment on the portion of the state jury's verdict that provided for the double recovery.

## I.

In 1996, the district court approved a nationwide class settlement of a number of consolidated lawsuits alleging damages resulting from serious defects in Inner-Seal Siding, a product of the Louisiana-Pacific Corporation. In the settlement agreement and the order approving it, the district court retained "exclusive and continuing" jurisdiction over any claim which in any way relates to any defect or alleged defect of Inner-Seal Siding that could reasonably be asserted by a class member and brought against Louisiana-Pacific in any court or forum, regardless of legal theory. The national class was composed of all individuals who owned or acquired a building that had Inner-Seal Siding installed prior to January 1, 1996. In return for Louisiana-Pacific's agreement to pay a then-undetermined amount of damages (which according to a special master's report dated November 17, 2003 involves claims in excess of $820 million), class members released it from all claims associated with their use of Inner-Seal Siding. They also fully released any entities within the chain of distri-

bution for Inner-Seal Siding. Among the distributors enjoying this collateral benefit of the settlement is the appellant, Lester, a manufacturer of hog barns. The agreement was formally approved by court order.

Despite the release it was granted by its customers in the settlement agreement, Lester sued Louisiana-Pacific in a Minnesota state court. Among the damages it sought, and the jury awarded, was the cost of repairs to its customers' buildings necessitated by the use of Inner-Seal Siding during the period covered by the settlement agreement. Lester's evidence at the state court trial was that the full cost of repairs to all of its customers' hog barns was $13.2 million, approximately $2 million of which was for barns built after January 1, 1996, and therefore not covered by the settlement agreement and order. The trial judge instructed the jury that although Lester was not a party to the settlement agreement, recovery on any claims for the cost of repairs to the buildings built prior to January 1, 1996 (during the period covered by the agreement) was barred, with two exceptions that are not relevant here. The jury nevertheless returned a verdict awarding Lester the full $13.2 million for the "Cost to Repair Buildings (those *not* barred by the class action)" (emphasis added). However, when asked on the special verdict form "[w]ithout regard to the class action, what is the total money that would fairly and adequately compensate Lester for the Cost to Repair Buildings (both those *in and out* of the class action)?" (emphasis added), the jury responded with the same figure — $13.2 million. In view of the evidence introduced by the plaintiffs, it is clear that, although the jury offered conflicting and inconsistent answers to the questions it was asked, the $13.2 million portion of the verdict it returned included both the $11.2 million in damages barred by the settlement agreement and the approximately $2 million for the period not covered by the agreement. In short, the jury awarded Lester compensation for the cost of repairs to *all* its customers' hog barns and not

merely for the cost of those that were *not covered* by the terms of the settlement agreement.[1]

Because Lester's customers would receive a double recovery, the district court permanently enjoined entry of judgment in the state court on $11.2 million of the jury's verdict, *i.e.,* that portion of the verdict awarding Lester damages for the cost of repairs to its customers' hog barns during the period covered by the settlement agreement and court order. The majority now holds that the jury's verdict does not constitute a threat to the district court's "exclusive and continuing" jurisdiction, that the district court may not set aside the verdict in aid of its jurisdiction over the implementation of the settlement, that the injunction is not necessary to protect the settlement and the court order, that the injunction is not authorized under the relitigation exception to the Anti-Injunction Act, and that Lester's interests in the state court action are not parallel to or in privity with those of its customers who are class members. I strongly disagree in all respects.

## II.

Under the All Writs Act, a district court may "issue all writs necessary or appropriate in aid of [its] respective jurisdiction[ ] and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The district court's power to issue an injunction against proceedings in a state court is limited by the Anti-Injunction Act which prohibits a federal court from enjoining state court proceedings "except as expressly authorized by . . . Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The interplay of the two Acts is well established in

---

[1]Lester obtained a total verdict of $29.6 million against Louisiana-Pacific covering all of its claims. Louisiana-Pacific does not challenge the propriety of the portion of damages that redresses direct losses that Lester itself suffered. It challenges only the award of repair costs of class members covered by the settlement agreement.

the federal courts. As we have explained, under the Acts an injunction is appropriate when (1) Congress has expressly authorized it; (2) it is necessary in aid of the federal court's jurisdiction; or (3) it is necessary to protect or effectuate the federal court's judgments. *See Bennett v. Medtronic, Inc.*, 285 F.3d 801, 805 (9th Cir. 2002). When any of these exceptions to the Anti-Injunction Act is present, the district court *may* issue an injunction, but it is not required to do so. *See Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 151 (1988). The decision to issue the injunction is committed to the sound discretion of the district court, *Blalock Eddy Ranch v. MCI Telecom. Corp.*, 982 F.2d 371, 375 (9th Cir. 1992), and its exercise is reviewed for an abuse of that discretion. *See Western Sys., Inc. v. Ulloa*, 958 F.2d 864, 867-68 (9th Cir. 1992).

The majority acknowledges that it is required to apply an abuse of discretion standard in reviewing a district court's exercise of its discretion to grant an injunction. Under that standard, a reviewing court cannot reverse the trial court unless it has a definite and firm conviction that the lower court committed a clear error of judgment in the conclusion that it reached upon a weighing of the relevant factors, *see United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002), or that the lower court's conclusion was based on an error of law. *See Western Sys., Inc. v. Ulloa*, 958 F.2d 864, 867-68 (9th Cir. 1992). The majority also acknowledges, as it must, that factual findings underlying the district court's decision to grant the injunction are reviewed for clear error. *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 653 (9th Cir. 2002).

Despite these acknowledgments, the majority impermissibly conducts a *de novo* review of the district court's ruling that the injunction was appropriate under *both* the second and third exceptions to the Anti-Injunction Act. The majority may be correct that the district court's ruling with respect to the third exception turned purely on a question of law — whether Lester was in privity with its class-member customers — and

thus was subject to *de novo* review. However, the majority's complaint regarding the district court's reliance on the second exception is based entirely on the majority's factual analysis of the effect of the Minnesota verdict upon the court's continuing jurisdiction over the federal action. This is essentially a factual dispute involving the exercise of judgment by the district judge. There is simply no allegation by the majority that the district court erred in its legal conclusions, that it exercised its discretion to an end not justified by the evidence, or that its judgment was clearly against the logic and effect of the facts as they were found. *See Rabkin v. Or. Health Sciences Univ.*, 350 F.3d 967, 977 (9th Cir. 2003). Instead of applying a deferential standard, the majority conducted a *de novo* review of the factual findings underlying the district court's decision to issue the injunction under the second exception and substituted its judgment for that of the district court. This, it may not do. *Scott*, 306 F.3d at 653. Regardless, however, of the standard applied, the majority plainly erred in reversing the district court's decision to issue an injunction on the bases of both the second and third exceptions to the Anti-Injunction Act.

## III.

I will discuss the second and third exceptions to the Anti-Injunction Act in reverse order, starting with the rule that injunctions may be issued when "necessary to protect or effectuate federal court judgments." That exception is also known as the relitigation exception. It "was designed to permit a federal court to prevent state court litigation of an issue that was previously presented to and decided by a federal court." *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1107 (9th Cir. 2003) (citation omitted).

The district court issued the injunction under the relitigation exception on the ground that "by permitting Lester to pursue to verdict claims for damages plainly covered by the class action settlement, the Minnesota court allowed relitiga-

tion of issues already presented to and decided by this court many years ago." *In re Louisiana-Pacific Inner-Seal Siding Litig.*, 234 F. Supp. 2d 1170, 1180 (D. Or. 2002). The majority disagrees primarily for the reason that "Lester was not named as a party to the class action and was not a member of the nationwide class. Nor were Lester's interests sufficiently parallel to the class members' interests such that privity could be implied." Maj. op. at 14587-88 (citations and footnotes omitted). The first reason is irrelevant and the latter is contrary both to the facts in the record and to indisputable principles of law.

There is no question that the Minnesota state court verdict involved the relitigation of issues that had been resolved by the settlement agreement. The settlement agreement covers

> any claim, [liability, right, demand, suit, matter, obligation,] *damage, loss or cost*, action or cause of action, of every kind and description that the Releasing Party [as defined] has or may have, whether known or unknown, asserted or unasserted, latent or patent, that is, has been, could reasonably have been or in the future might reasonably be asserted by the Releasing Party either in the Action or in any other action or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any of the Defendants, *arising from or in any way relating to any defects or alleged defects of [Inner-Seal Siding]*, or any part thereof.

*In re Louisiana-Pacific*, 234 F. Supp. 2d at 1172 (quoting the settlement agreement) (emphasis added). The scope of the agreement is broad and comprehensive. It resolves *any* claim, damage, loss, or cost which in *any* way relates to *any* defect or alleged defect of Inner-Seal Siding that might reasonably be asserted by *any* class member and brought against Louisiana-Pacific in *any* court or forum, regardless of legal

theory. The effect of the settlement agreement is to bar any future claim for the same damage, loss, or cost, including principally the cost of repairs arising from any defect in Inner-Seal Siding.

In March, 2000, Lester filed an action in Minnesota state court seeking to recover damages for numerous injuries, specifically including the cost to its customers of repairing their buildings covered by the settlement agreement. When the case went to trial, Lester offered evidence that the removal and replacement of Inner-Seal Siding on all of its customers' hog barns would cost $13.2 million, with approximately $2 million of that amount being allocated to barns built after January 1, 1996, and therefore *not covered* by the settlement agreement. Despite the trial judge's instruction to award damages only for the cost of repairing barns *not covered* by the settlement agreement, the jury returned a verdict covering the costs of repairing *all* the barns, both those covered by the settlement agreement and those outside its scope. Thus, instead of awarding Lester only the $2 million it sought for barns constructed post-January 1, 1996, it also awarded an additional $11.2 million for the cost of repairs to the settlement agreement barns. As a result, the jury's verdict conflicts directly with the settlement agreement and federal court order, and it may properly be enjoined. We have stated the rule plainly: "A district court may properly issue an injunction under the relitigation exception if 'there could be an actual conflict between the subsequent state court judgment and the prior federal judgment." *G.C. & K.B. Invs.*, 326 F.3d at 1107 (quotations omitted).

The majority asserts that the issue of the jury's disregard of the trial judge's instruction is a matter for the state courts to resolve.[2] Although the question of the effect on the state court

---

[2]Had the jury followed the trial judge's instructions, it would have returned a verdict of only $2 million for repair costs instead of $13.2 million. Although the jury clearly violated the trial judge's directives, the judge declined to disturb the verdict, thus upholding the double recovery award. *See* Maj. op. at n.27.

proceedings of the jury's disregard of the instruction may be a matter for the state courts, the question whether the verdict the jury returned is consistent with the settlement agreement and the federal court order is a federal question. *See In re Agent Orange*, 996 F.2d 1425, 1431 (2d Cir. 1993) ("The court best situated to make this determination [as to the scope of the settlement agreement] is the court that approved the settlement and entered the judgment enforcing it."). For purposes of the relitigation exception, there is no difference between a verdict that results from the jury's disregard of the court's instruction and one in which the instruction was not given at all. In either case, entry of final judgment on the verdict as returned by the Minnesota jury would have the impermissible effect of allowing the circumvention of the settlement agreement and the receipt of duplicate damages and costs that are directly covered by it. *See In re Louisiana-Pacific*, 234 F. Supp. 2d at 1180. In both cases, the intrusion into the district court's domain by the state court is the same; the potential judgment constitutes a serious threat to the court's ability to protect its settlement agreement and, accordingly, the district court is authorized to prevent its entry.

The majority concludes that even if the jury's disregard for the settlement agreement is not a question for the state courts alone, the Minnesota verdict does not conflict with the settlement agreement because "the prayer for repair costs presented a cognizable state law claim belonging to Lester." Maj. op. at 14590. Lester argues, and the majority agrees, that notwithstanding the settlement agreement and notwithstanding the trial court's instruction, the $11.2 million award for repair costs that Lester received was an award to which Lester was entitled under Minnesota law. Once again, the fundamental problem with this argument is that whether or not Lester had a "cognizable state law claim" is inconsequential to the question we must decide — whether the jury's award is inconsistent with the settlement agreement. There can be no doubt that it is. The jury awarded damages for the very same repair costs previously provided for in the settlement agreement and dis-

trict court order. In doing so, it stripped Louisiana-Pacific of the protection against further liability that lies at the heart of the settlement agreement. The jury's verdict is in direct conflict with that agreement and with the federal court order.

The settlement agreement completely resolved the issue of liability for any damage, loss, or cost incurred by Lester's customers as a result of their use of Inner-Seal Siding. Even if the majority were correct that Lester's "cognizable state law claim" was not itself litigated in the class action, the fact that the *issue* on which that claim relies has been fully litigated in federal court is sufficient justification for the district court's injunction. *See Chick Kam Choo*, 486 U.S. at 147 (stating that the relitigation exception is "designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court"). If enterprising litigants like Lester were allowed to relitigate claims covered by the settlement agreement merely by alleging them as a matter of a particular state's law, "the finality of virtually any class action . . . could be defeated by subsequent suit brought by [parties] asserting rights derivative of those released by the class members." *In re Baldwin-United Corp.*, 770 F.2d 328, 336 (2d Cir. 1985).

Here, of course, not only was the issue of the compensation for the cost of repairs due to the owners of barns built with Inner-Seal Siding fully litigated and resolved by the settlement agreement, but the state court jury awarded Lester substantial damages for the purpose of making the same repairs already paid for by Louisiana-Pacific under the damage award in that agreement. In the absence of the injunction, this double recovery would have occurred notwithstanding the district court's 1996 order and judgment, under which the class settlement damages were intended to be the only damages Louisiana-Pacific would be required to pay on account of the harm to the barns involved. The Second Circuit has held, in an important and highly persuasive opinion, that the issuance of an injunction is appropriate in such circumstances. In *In re*

*Baldwin-United Corp.*, thirty-one states that were not parties to a federal court settlement against a group of securities broker-dealers were enjoined from bringing state court actions against the dealers where the damages sought by the states were intended to be paid over to persons who were parties to the settlement agreement. *See In re Baldwin-United Corp.*, 336 F.2d at 337. The Second Circuit upheld the injunction, stating, "[i]f the states or others could derivatively assert the same claims on behalf of the same class members or members of it, there could be no certainty about the finality of any federal settlement . . . . The effect would be to threaten to reopen the settlement . . . ." *Id*. In short, the Second Circuit warned, the same claims could be relitigated in every state and the district court judgment would be indeterminate.

As in *In re Baldwin-United Corp.*, the finality of the district court's order and judgment are in jeopardy in the case before us. The settlement agreement would be meaningless if distributors or others in the chain of distribution, like Lester, could circumvent the federal judgment by filing suit in their own name, and then recover damages *for the benefit* of their class member-customers. Had the verdict been entered as returned, Louisiana-Pacific would have been required to pay Lester $11.2 million to make repairs for its customers who had already been compensated for the damage they suffered and, thus, contrary to the settlement agreement, would, unlike all other class members, receive double compensation for the damage to their barns. I can conceive of no reason why entry of a verdict cannot be enjoined when a state court jury awards money to compensate a party for loss or damage for which that party has already been compensated under a settlement agreement in federal court — an agreement expressly designed to provide the exclusive remedy for those damages. In fact, "[e]ven if no actual conflict is possible, an injunction could still be proper if res judicata would bar the state court

proceedings." *G.C. & K.B. Invs.*, 326 F.3d at 1107 (quotations omitted).[3]

Lester clearly sought a double recovery for its customers. As a result of the settlement agreement, Lester had no liability to its vendees and no risk associated with potential lawsuits by them. Thus, the award for "Cost to Repair Buildings" covered by the settlement agreement could not result from any damage Lester suffered. Accordingly, the only recovery Lester could have sought was *on behalf of* its customers. We need not speculate on this point, however. At trial in the Minnesota state court, Lester's president testified. He told the jury that the company sought damages to "fix these buildings" and to get each customer "what he's entitled to." Lester's "Cost to Repair Buildings" damage award was undeniably made for

---

[3]Judge Silverman's concurrence asserts that "once [Louisiana-Pacific] raised its res judicata defense in state court and that court ruled on it," the district court should have deferred to the state court's ruling and thus declined to consider the relitigation exception. It is unclear to which state court ruling Judge Silverman is referring, and his implication that the state court ruled against Louisiana-Pacific on the res judicata issue prior to the district court's issuance of its injunction is wrong. In fact, the converse is true: the state court instructed the jury that the settlement agreement barred recovery for repair costs incurred during the settlement period. (Indeed, even the majority opinion acknowledges that the trial court ruled in Louisiana-Pacific's favor on the res judicata issue. *See* Maj. op. at 14570.) The jury then returned the disputed verdict. Before the state court issued any ruling with respect to the validity of the jury's action, the federal court issued the injunction. Thus, the principal cases upon which Judge Silverman relies in his concurrence, *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518 (1986), and *Ramsden v. Agribank, FCB*, 214 F.3d 865 (7th Cir. 2000), in both of which the state courts had expressly rejected a res judicata defense *before* the injunction issued are completely inapposite. Moreover, in *Parsons* the state court had entered its *judgment* prior to the federal court injunction, a fact that was central to the Supreme Court's ruling: "We hold, therefore, that the Court of Appeals erred by refusing to consider the preclusive effect . . . of the state-court judgment." 474 U.S. at 525. Here, the Minnesota court had not ruled on the legality of the jury's verdict, let alone entered judgment, prior to the issuance of the injunction.

the purpose of satisfying the same claims resolved by the class settlement. This is why the Minnesota court gave the instruction that the jury disregarded: any claim for damages covered by the settlement agreement was barred. The $11.2 million enjoined by the district court was awarded *solely* for the damage to Lester's customers' property, not Lester's. There can be no dispute that the $11.2 million enjoined by the district court is an award *for the benefit* of the class member-customers, and not for the benefit of Lester.

The majority attempts to avoid the problem posed by double recovery on the basis that Lester was not a party to the class action. It asserts that compensating Lester so that it may pay the costs of repairing its customers' hog barns is somehow different from compensating Lester's customers directly. However, because Lester seeks recovery for the same damage, loss, or cost that has already been paid to its customers under the settlement agreement, and because Lester is simply serving as a conduit for the obtaining of additional compensation for those same customers for that same harm, it is irrelevant that Lester was not itself a party to the settlement agreement. The terms of the settlement agreement clearly provide that the fund it establishes shall be the exclusive source of relief for class members and shall fully resolve any damage, loss, or cost to those class members. Whether the jury's award is given to Lester's customers or to Lester for the benefit of its customers, Louisiana-Pacific would be required under the prospective state court judgment to pay double compensation in order to remedy the harm for which it had already paid the agreed-upon compensation. Regardless of Lester's lack of participation in the federal case, the jury's award is inconsistent with the settlement agreement.

That a non-party may be precluded from relitigating in state court an issue already decided in federal court is well established in federal law. In *In re Baldwin-United Corp.*, the thirty-one States Attorneys General who brought the action sought "to enforce state laws authorizing them in their repre-

sentative capacities to seek restitution and monetary recovery from the defendants to be paid over to those of the states' citizens who are plaintiffs in the consolidated class actions . . . ." 770 F.2d at 332-33. The states were, like Lester, beneficent strangers to the class settlement and possessed a cognizable state law claim. They argued, like Lester, that they were not barred by the settlement agreement from obtaining a recovery in their own right, albeit for the benefit of class members. They acknowledged that their intent was "to pursue remedies in the state[s'] name[s]" by "tak[ing] back the restitution that consumers deserve." *Id.* at 332 n.1. For this reason, they claimed that any damages received by the states would not constitute a "double recovery," even though the class members would be the ultimate beneficiaries. *Id.* The Second Circuit upheld the district court's injunction on the ground that

> no defendant in the consolidated federal actions . . . could reasonably be expected to consummate a settlement of those claims if their claims could be reasserted under state laws, whether by states on behalf of the plaintiffs *or by anyone else, seeking recovery of money to be paid to the [class] plaintiffs.* Whether a state represented itself to be acting as a 'sovereign' in such a suit or described its prayer as one for 'restitution' or a 'penalty' would make no difference if the recovery sought by the state was to be paid over to the [class] plaintiffs.

*Id.* at 336-37 (emphasis added). The court's holding was not dependent upon any finding that the states were in privity with class members. Nor did the court find it relevant that the states were authorized to file their action under applicable state laws or that they asserted a "cognizable state law claim." Whether Lester was a party to the settlement agreement or was in privity with any such party is beside the point. The jury's verdict can be enjoined simply because it awards additional damages to be used for the benefit of class members in satisfaction of claims for which they have already been com-

pensated under the settlement agreement. The fact that a third party brings the action in its own name is without consequence. *In re Baldwin-United Corp.* is the leading case in the area; it is correct, and there is no reason to create a direct conflict with it.

The majority contends, nevertheless, that privity is necessary for a non-party to be bound by the settlement agreement. *See* Maj. op. at 14587-88 n.24. Even if it is, the district court's order would stand. Privity "is a legal conclusion designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved." *United States v. Schimmels (In re Schimmels)*, 127 F.3d 875, 881 (9th Cir. 1997) (quotation marks and citation omitted). Although privity was originally reserved for specific relationships such as indemnitors and indemnitees, we have noted that "[r]ecent cases apply the privity concept in a much more flexible manner . . . and courts have found the existence of privity in an array of disparate circumstances summarized under the heading of 'virtual representation.' " *See Kourtis v. Cameron*, No. 03-56703, slip op. at 10584 (9th Cir. Aug. 15, 2005). An example of one such relationship is where a party to a pending action has "sufficiently similar interests" to a non-party that litigated the same issue in a prior action. *See Trevino v. Gates*, 99 F.3d 911, 924 (9th Cir. 1996) (holding that a child who filed an action seeking punitive damages as the result of the killing of her father was in privity with her grandmother who earlier sued concerning the same events, because the grandmother had a "tremendous incentive" to recover punitive damages); *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir. 1980) ("Courts have recognized that a non-party may be bound if a party is so closely aligned with its interests as to be its 'virtual representative.' " (citation omitted)).

The majority simply asserts that Lester's interests were not "parallel" to those of the class members and, thus, they were not in privity. It provides no explanation as to why Lester's

claim for an award of "Cost to Repair Buildings" owned by class members and covered by the settlement agreement is not parallel to those of the class members themselves. Lester simply sought to obtain a further recovery for the same injury suffered by the class members, with the intention of passing the recovery along to those members. In essence, Lester sought to serve as a conduit for its customers by obtaining additional damages on their behalf. The privity here is far stronger than in *Trevino* where the grandmother and granddaughter each sought separate recoveries for their own benefit.[4] Certainly, the class members here had a "tremendous incentive" to recover the damages that Lester later sought on their behalf. *See Trevino*, 99 F.3d at 924. Certainly, Lester and its customers had "sufficiently similar interests. *See id.* Accordingly, I conclude that Lester has no greater, or different, interest in the "Cost to Repair Buildings" covered by the settlement than did its customers, and that *Trevino*, which binds us, compels the affirmance of the district court's injunction.

Although Lester may not have had a full opportunity to litigate its customers' claims in the federal court, its customers themselves adequately represented any interest that Lester might have had in seeing that its customers' hog barns were repaired. *See ITT Rayonier*, 627 F.2d at 1003. As such, Lester's interests and those of its customers are absolutely parallel and Lester's interests were fully represented and

---

[4]The majority's assertion that *Trevino* is "readily distinguishable" because here there is no familial relationship between the parties in privity misses the point. In *Trevino*, the critical issue was not the familial relationship but rather that "the interests of Trevino and her grandmother are so similar that Trevino's grandmother virtually represented Trevino in [the prior litigation]." 99 F.3d at 924. The facts here are fundamentally indistinguishable; Louisiana-Pacific's own president testified during the state court trial that the focus of that litigation was to get each customer "what he's entitled to." However, as in *Trevino*, his customers' interests had been fully represented in the prior federal action and were protected by the settlement agreement.

vigorously pursued by the customers during the settlement proceedings. *See Schimmels*, 127 F.3d at 881; *Trevino*, 99 F.3d at 924. Accordingly, Lester is in privity with its customers and is barred from receiving the portion of the jury's verdict that would compensate its customers twice for the cost of the same repairs. *See In re Baldwin-United Corp.*, 770 F.2d at 336; *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 460-62 (2d Cir. 1982) (holding that claims based on the "identical factual predicate" as those covered by the settlement agreement were barred by a prior judgment on the settlement). The district court did not err when it issued the injunction pursuant to the relitigation exception.

## IV.

The district court also based its injunction on the second exception to the Anti-Injunction Act, injunctions that are "necessary in aid of [ ] jurisdiction." 28 U.S.C. § 2283. Regarding that exception, the district court held that:

> [I]n the exercise of my discretion [I] conclude that the requested injunction is proper and should issue. . . . [Allowing Lester's case in Minnesota to proceed would] circumvent the settlement agreement and the elaborate negotiated claims resolution procedures contained therein, and create, as [Louisiana-Pacific] suggests, a "subclass" of class members whose claims would, if the jury verdict is permitted to stand, enjoy special treatment not available to other class members. Moreover, there is a substantial risk that others in Lester's position, encouraged by the jury verdict, will pursue similar claims, thus further impairing the class action settlement and interfering in this court's stewardship over it.

*In re Louisiana-Pacific*, 234 F. Supp. 2d at 1180. As the district court's ruling demonstrates, the "necessary in aid of jurisdiction" exception is quite similar to the relitigation

exception, and in some respects, overlapping. From a pragmatic standpoint, the basic elements of the two exceptions are essentially the same. The principal difference is that the former exception is generally applied at an earlier stage of the litigation, before the settlement is fully implemented. Nevertheless, in many cases in which an injunction has been affirmed under the relitigation exception, it has also been affirmed under the "necessary in aid of jurisdiction" exception. *See, e.g.*, *Flanagan v. Arnaiz*, 143 F.3d 540, 545-46 (9th Cir. 1998); *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877, 881-83 (11th Cir. 1989) (holding that both exceptions applied where a judgment pursuant to a settlement agreement in federal court was entered five years prior to the enjoined state court action, and the federal court had retained jurisdiction for the purpose of construing and implementing terms of the settlement); *United States v. Am. Soc'y of Composers, Authors & Publishers*, 442 F.2d 601, 603 (2nd Cir. 1971). Thus, to the extent that I have already responded to the majority's arguments in discussing the relitigation exception, I will not reiterate that analysis here. Nor will I reiterate any of the affirmative arguments I have already advanced as to why the issuance of the injunction was necessary. I will note only that for the reasons offered earlier, it is clear to me not only that the district court did not err when it issued its injunction in reliance on the relitigation exception, but also that it did not abuse its discretion when it relied on the "necessary in aid of jurisdiction" exception as well.

In reaching its decision regarding the "necessary in aid of jurisdiction" exception, the district court explained that serious issues pertaining to the implementation of the federal class settlement remained unresolved. First, the district court found that insofar as Lester claimed damages for the cost of repairing its customers' hog barns, those customers covered by the settlement agreement would effectively become a subclass that would enjoy special treatment unavailable to other class members, specifically the double recovery of their damages. Second, the district court expressed concern that if the

jury's verdict were allowed to stand, a flock of enterprising Lester-like plaintiffs might appear in state courts around the country, seeking remuneration for claims *on behalf of* customers covered by the settlement agreement. The possibility of these occurrences threatened the settlement agreement because, among other reasons, there would be a risk that the agreement would no longer provide the *exclusive* relief for customers that the parties intended.[5] Third, the district judge found that the state court verdict, if not enjoined, would "seriously impair the integrity of this court's Order, and directly interfere with and seriously impair my ability to supervise, implement, enforce, construe and interpret the class action settlement agreement over which I have retained exclusive jurisdiction." These concerns are not trivial and taken together, there can be no question that they created a substantial and serious risk that the district court's jurisdiction over the class would become "nugatory." *See Bennett*, 285 F.3d at 806.

The district court's third factual finding, that the state court verdict would substantially impair its ability to supervise the settlement agreement, was made at a time when Louisiana-Pacific was still very much in the process of satisfying the terms of that agreement. The majority, in its effort to make it appear as though the federal litigation was over and done with and that the district court had little if any supervision left to perform, makes much of the fact that, as of September, 2003,

---

[5]The settlement agreement provides that "the [district] Court shall retain *exclusive and continuing* jurisdiction of the Action, all Parties and Settlement Class members, to interpret and enforce the terms, conditions, and obligations of this release." *In re Louisiana-Pacific*, 234 F. Supp. 2d at 1173 (quoting the settlement agreement) (emphasis added). Similarly, the district court order approving the agreement states that the district court retains *"exclusive and continuing* jurisdiction over the Actions and Parties, including all members of the Class, the administration and enforcement of the settlement, and the benefits to the Class, including for such purposes as supervising and implementation, enforcement, construction, and interpretation of the Settlement Agreement." (emphasis added).

Louisiana-Pacific had paid approximately $509 million in satisfaction of $823 million in claims and that less than $20 million remained in valid and approved unfunded claims. However, those were not the facts before the district court when it issued its injunction in December, 2002. At that time, the final day for class members to file claims against Louisiana-Pacific had not yet arrived and the company had not yet decided whether to satisfy in full all of the remaining valid and approved unfunded claims. In fact, one mechanism for funding outstanding claims, the Claimant Offer Program, was not approved until March 24, 2003, three months after the injunction was issued. Thereafter, on June 27, 2003, the court approved a stipulation between class members and Louisiana-Pacific regarding the implementation of that program. Thus, the majority mischaracterizes the facts regarding the status of the federal litigation, which the appointed special master described as "one of the largest and most complex class action settlements ever reached in the United States." The settlement was still at a sensitive stage and the district court acted within its discretion when it concluded that the state court action threatened its stability.

The majority disagrees with the district court's statement of the relevant facts and its analysis of them. It premises its decision on the misguided assumption that the district court's work was done (in which case the relitigation exception would still apply). The majority writes:

> [t]he necessary in aid of jurisdiction exception is inapplicable here because the state court action did not threaten the district court's jurisdiction over the Inner-Seal Siding litigation. By the time that the court issued the injunction, the Inner-Seal Siding class action had long since been resolved. Indeed, the district court had several years earlier approved the settlement and entered final judgment. Because the litigation was over, the state court action could not have interfered with the district court's consider-

ation or disposition of the class claims. Nor could it have interfered with the court's continuing jurisdiction over the settlement. The membership of the class was fixed, the parties' respective rights and liabilities were resolved, the settlement fund had been established and claims were being paid.

Maj. op. at 14581 (internal citation omitted). In other words, the majority finds, erroneously, that the district court had, from a practical standpoint, exhausted its jurisdiction. It asserts that the class action "had long since been resolved," and that there was, therefore, no threat to the court's jurisdiction. It concludes, therefore, that the court was without the authority to issue an injunction under the "necessary in aid of jurisdiction" exception.

The first problem with the majority's holding is that it is based on erroneous findings of fact improperly made by an appellate court. My colleagues mischaracterize the status of the class action and ignore the district court's factual findings regarding the threat that the jury verdict posed to the ongoing implementation of the complex settlement agreement. The majority holds that the "necessary in aid of jurisdiction" exception is inapplicable because "the Inner-Seal Siding class action had long since been resolved[,] . . . [t]he membership of the class was fixed, the parties' respective rights and liabilities were resolved, the settlement fund had been established and claims were being paid." Maj. op. at 14581 (citation omitted). That is, of course, a different view of the status of the case than the district court expressed when it determined that the jury verdict interfered with the ongoing administration of the settlement fund. It is also a different view than is revealed by an examination of the factual record. The "necessary in aid of jurisdiction" exception is inapplicable only when the district court's jurisdiction has been so completely exhausted that the intrusion by a state court on its exercise of its jurisdiction would be meaningless. The exception is not, as the majority suggests, inapplicable simply because the district court has

entered a settlement agreement that is in the process of being implemented under the active supervision of the court.

Here, although the "membership of the Inner-Seal Siding class and the terms of the settlement were approved and finalized long before the district court issued the injunction," Maj. op. at 14584, all class members' claims had not been paid (nor had they all even been made) as of the date the injunction was issued, and the administration of the settlement was ongoing. Much remained to be done to carry out the settlement both by the parties and the court. The district court's injunction was designed to ensure that the remaining class claims would be funded and paid, and that Louisiana-Pacific would not be required to compensate class members for the same damage, loss, or cost in another forum at any time in the future. Without the injunction, the court's enforcement jurisdiction and the final settlement of all claims were, in the district court's judgment, seriously threatened. Accordingly, the court had the discretion to issue the injunction under the "necessary in aid of jurisdiction" exception.

Second, the majority disregards the provision of the settlement agreement and the district court order expressly retaining "exclusive and continuing" jurisdiction over the enforcement of the settlement agreement, "including [ ] such purposes as supervising and implementation, . . . construction, and interpretation of the Settlement Agreement." In *Flanagan*, 143 F.3d at 540, we held that the inclusion of such a provision, establishing "exclusive" enforcement jurisdiction in the district court provides a sufficient basis for the invocation of the "necessary in aid of jurisdiction" exception. *See id.* at 546; *see also Battle*, 877 F.2d at 880-83*; Am. Soc'y of Composers*, 442 F.2d at 603. The reason is that the court's jurisdiction over the settlement agreement finds its source in the express provision of the settlement agreement and court order retaining exclusive and continuing jurisdiction; it is "more than just a continuation or renewal of jurisdiction." *See Flanagan*, 143 F.3d at 544 (quotations omitted). In this case, the

district court included in its order exactly the kind of express provision described in *Flanagan*. Accordingly, the district court's reliance upon *Flanagan* was not improper, and its invocation of the "necessary in aid of jurisdiction" exception was appropriate.[6]

The third reason that the district court's decision should be affirmed pursuant to the "necessary in aid of jurisdiction" exception is that the mere complexity of the settlement justifies the court's issuance of the injunction under that exception. *In re Diet Drugs*, 282 F.3d 220, 236 (3d Cir. 2002). The settlement agreement in the case before us, which is well in excess of a half-billion dollars, brought to a conclusion litigation that combined three nationwide class actions plus a number of similar statewide actions. The settlement agreement's comprehensiveness is especially important because the district court and the parties invested enormous resources in its approval and enforcement. Because the settlement agreement is complex, it is especially vulnerable to state actions that may frustrate the district court's attempt to oversee its administration. *See id.*, 282 F.3d at 235-37 and 235 n.12 ("It is in the nature of complex litigation that the parties often seek complicated, comprehensive settlements to resolve as many claims as possible in one proceeding. These cases are especially vulnerable to parallel state actions . . . .").

The majority disregards the complexity of this case. It asserts only that, historically-speaking, the "necessary in aid of jurisdiction" exception arose from the rule that actions *in*

---

[6]In its analysis of the necessary in aid of jurisdiction exception, the majority seeks unsuccessfully to distinguish *Flanagan* on the ground that, in that case, disputes arising from the settlement agreement were still being litigated in federal court when the plaintiffs sought to pursue their state court claims. The majority's argument ignores the fact that in our analysis of the Anti-Injunction Act's exceptions in *Flanagan* we considered only the fact that the settlement agreement had conferred continuing jurisdiction; we did not once mention the import of ongoing disputes in federal court. *See* 143 F.3d at 545-46.

*rem* should be able to proceed in one jurisdiction without interference from another. *See* Maj. op. at 26-27. Relying on Supreme Court case law from 1922, the majority concludes that the "general rule" today is that where an action is strictly *in personam*, there is no objection to a subsequent action in another jurisdiction. Maj. op. at 27. However, the majority fails to recognize that, despite the "general rule" against issuing injunctions in *in personam* actions, there is an exception for complex litigation cases. "In several cases, courts have analogized complex litigation cases to actions in rem." *In re Diet Drugs*, 282 F.3d at 235-36 and 235 n.12 (citing cases); *see also Battle*, 877 F.2d at 882 ("it makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered . . . This lengthy, complicated litigation is the 'virtual equivalent of a res.' "(citations omitted)); *In re Baldwin-United Corp.*, 770 F.2d at 337 (same). Thus, as the district court found, the settlement before us *is* akin to a res and any state court action that might interfere with that court's oversight of it constitutes a serious threat to the federal court's ability to manage the final stages of this complex litigation. Far from weakening the justification for the application of the "necessary in aid of jurisdiction" exception, the substantial progress of the district court proceedings in resolving this complex dispute made the threat of the Minnesota court all the more serious and made the injunction all the more necessary.

The district court found that "the Minnesota state court's actions seriously impaired the integrity of the court's Order, and directly interfere[d] with and seriously impair[ed] [the court's] ability to supervise, implement, enforce, construe and interpret the class action settlement agreement over which [it] retained exclusive jurisdiction." *In re Louisiana-Pacific*, 234 F. Supp. 2d at 1180. Although, as the majority says, "the membership of the class was fixed, the parties' respective rights and liabilities were resolved, the settlement fund had been established and claims were being paid," the district court, aware, *inter alia*, of the prospect that Louisiana-Pacific

could decline to continue funding the settlement, found that the risks flowing from the Minnesota verdict were sufficiently serious that the court's continuing jurisdiction over the settlement would be jeopardized. The majority arbitrarily rejects this finding. It also refuses to recognize that a double recovery for a particular sub-class of the class plaintiffs constitutes a threat to the settlement agreement and the court order, and it is not willing to acknowledge the potential for harm that could result from the proliferation of state-by-state third party benefactor litigation. These potential occurrences, however, as the district court found, constitute serious and substantial threats to the exercise of the court's jurisdiction. It was well within the discretion of the district court to reach that determination.

The majority does not offer any valid explanation as to why the consequences that would flow from entering the Minnesota jury verdict in this complex litigation do not constitute serious threats to the orderly administration of the class settlement. Although my colleagues may disagree with the district court's decision, all of the court's underlying findings are supported by the record, and the district judge reasonably relied upon the law of our circuit and others. The district judge did not abuse his discretion or commit clear error when he determined that the injunction should issue under the "necessary in aid of jurisdiction" exception. In fact, in my opinion, the district court did a remarkably good job with the law and reached the correct result with respect to both Anti-Injunction Act exceptions on which it relied.

## V.

In conclusion, it is clear that Lester's state law claims pursued on behalf of and for the benefit of its customers may be enjoined under both exceptions relied upon by the district judge, the relitigation exception and the "necessary in aid of jurisdiction" exception. The majority's decision not only condones a double recovery by a sub-group of class members in direct contravention of the settlement agreement, but it

encourages similar disruptive litigation in other states. Because the Minnesota jury's verdict clearly included damages covered by the settlement, allowing it to stand would circumvent the settlement agreement and seriously impair its integrity, as well as the federal court's ability to supervise, implement, enforce, construe, and interpret the class action settlement over which it has exclusive jurisdiction. In arriving at the determination that the injunction should issue, the district court reasonably relied upon the law of our circuit and others and made underlying findings that were supported by the evidence and which may not be disturbed by an appellate court. I would affirm.

I respectfully dissent.